CHARLIE KING, Appellee, v. H. H. FRAME et al., Appellants.

CEMETERIES: Lots—Sale—Conflicting Purchases—Priority. One who,
1  in good faith, purchases a vacant and wholly unoccupied lot in a
    township-controlled cemetery, and proceeds to bury his dead there-
    in, without actual or constructive notice that the lot had been
    previously sold to another, acquires rights superior to those of
    such prior purchaser. And this is true whether the deed to such
    prior purchaser was or was not recorded, because the statute (Sec.
    5570, Code of 1927) fails to declare that the legal effect of record-
    ing such a deed is to impart constructive notice to subsequent
    purchasers.

DEAD BODIES: Disinterment—Controlling Principle. Equity will
2  order the disinterment of a dead body for reburial only in cases
    of extreme necessity.

Headnote 1:  11 C. J. p. 60 (Anno.).  Headnote 2:  17 C. J. p. 1140.

Headnote 2:  42 L. R. A. 729; 8 R. C. L. 697.

*Appeal from Wayne District Court.*—A. R. MAXWELL, Judge.

DECEMBER 13, 1927.

This is an action in equity, to quiet title to a certain ceme-
tery lot and to require the defendant Cynthia Elder to remove
the body of her late deceased husband therefrom, on the ground,

among others, that the plaintiff is the owner of said lot, and that trespass had been committed thereon by burying the body of John Elder in said lot.—*Reversed.*

*Bracewell, Murrow & Poston,* for appellants.

*Steele & Miles,* for appellee.

ALBERT, J.—The township trustees of Wright Township, Wayne County, Iowa, are among the defendants herein. On November 6, 1916, the trustees of said township conveyed Lot 165 in the cemetery in controversy to the plaintiff, Charlie King, by deed. This deed was not acknowledged, and was not recorded. John Elder, husband of Cynthia Elder, appellant herein, died on the 18th day of May, 1924, and on application to the proper authorities for a place in said cemetery for the burial of the body of said John Elder, Cynthia Elder bought said Lot 165, and on May 20, 1924, the body of her husband, John, was interred therein. She did not receive a deed for this lot, however, until April 17, 1925, when she paid for the same. She says:

1. CEMETERIES: lots: sale: conflicting purchases: priority.

"The reason I did not pay for the deed before was that I did not see the board, and because King [plaintiff] was causing a confusion."

Plaintiff alleges that he was the owner of said lot in Confidence Cemetery under the aforesaid deed to him, made in 1916, and that Cynthia Elder wrongfully buried the body of her husband on said lot, and is now wrongfully and unlawfully depriving plaintiff of the use, possession, and right to said burial lot. He asks that the right of possession be restored and placed in the possession of plaintiff, to be by him used as a burial place for his dead; that title in said lot be confirmed and established in him; that the defendants be required to remove or permit said body of said John W. Elder to be removed from said lot, in accordance with a permit from the state board of health; and that the defendants, and each of them, be forever barred from ever interfering with the ownership and right of possession as a burial place for plaintiff's dead, and for such other and further relief as may be equitable, and for costs.

It appears from the evidence that the clerk and trustees of this township did not keep any record book for the recording of

deeds, as provided by Section 584, Code of 1897. The King deed was never recorded, and there is nothing to show that he ever requested that the same be so recorded. So far as the record is concerned, there is nothing to show that he ever physically took possession of said lot, or that he ever made any improvements thereon. The record further satisfactorily shows that, up to the time of the burial of John Elder thereon, the lot was wholly unoccupied. The records of the township trustees were introduced, and they showed nothing material with relation to this matter; but it does appear that there was a linen plat of the cemetery, as originally laid out, with the lots numbered thereon, and that, when a lot was sold, the purchaser's name was written on the place in the plat where the lot was numbered. This was the only record that was ever kept with relation to the sale of lots in this cemetery. For some unexplained reason, when Lot 165 was sold to King, in 1916, his name was not written on the plat. It does appear, however, that the township trustees had a book of blank deeds, and when a lot was sold, the deed was filled out and delivered to the purchaser, and the stub remained in the book for each deed; and in this book there is a stub, showing the sale of this lot to King. Aside from this, there was nothing whatever in the records of the township trustees to show that the lot had been sold to King, at the time Cynthia Elder attempted to make the purchase thereof.

The aforesaid Section 584, Code of 1897, reads as follows:

"All conveyances of subdivisions or lots of a cemetery thus platted shall be by deed from the proper owner, which deed shall be recorded with the township clerk in a book kept by him for that purpose, for the recording of which the said clerk shall be entitled to a fee of fifty cents for each instrument recorded, to be paid by the party desiring the record made."

It is insisted that, because King's deed was not recorded, as provided in this section, Cynthia Elder was not bound to take notice of his rights in said lot. A review of all of the various sections of the Code providing for the recording of instruments conveying real estate or personal property shows that each contains a provision that by recording the instrument, as provided by statute, notice to the world is given, and that a failure so to record invalidates the instrument, as against a person who is a good-faith purchaser, without notice. No such

provision as to constructive notice, however, is attached to the
section of the statute which we have before us for consideration.
It must follow, therefore, so far as this case is concerned, that
whether or not King had his deed of record is wholly immater-
ial; because, if he had it of record, as the law requires, it would
not have been held in law to be constructive notice to Mrs.
Elder. The evidence shows that she purchased this lot without
knowledge of his right or claim of right. The lot was wholly
unoccupied and unimproved at the time in question. She
bought from the proper authority, and there was nothing on the
lot at the time to warn her, or to indicate that any other person
had any rights in or could make any claim to said lot. Relying
on this situation, she purchased the lot, and buried the body of
her husband thereon.

It is insisted by appellee, King, that this case is controlled
wholly by the case of *Carter v. Town of Avoca*, 197 Iowa 670.
In that case, the Harris family bought and received a deed to
the south half of Lot 110. They had buried members of their
family on the southeast quarter of the lot, and had one grave
on the southwest quarter. One Henry Kuhl purchased the
southwest quarter of said lot in 1919, and on his death, in 1920,
he was buried thereon. In our opinion, the *Carter* case is not
controlling in the case at bar. In that case, the lot was occupied
by the graves of the Harris family, and one grave was on the
part of the lot purchased by Kuhl. The last purchaser could,
by observation, have seen that the lot was occupied, and he was
bound to take notice of this fact. When he purchased the lot,
he did so with knowledge, either actual or constructive, that
the same was occupied, for burial purposes; and having pur-
chased under these circumstances, he took it at his hazard.

In the case at bar, however, when Cynthia Elder bought
this lot, it was wholly unoccupied and unimproved. To one who
went upon the ground and looked at the lot there was nothing
to give notice that the lot had been occupied for burial purposes
by anyone. There was nothing to show that the lot was im-
proved, even to the extent of keeping the grass mowed thereon.
The question, therefore, is whether, in equity, in the light of all
of these circumstances, the plaintiff was entitled to the relief
granted him by the district court. We are disposed to hold
that he was not.

In the case of *Thompson v. Deeds,* 93 Iowa 228, we said:

"A proper appreciation of the duty we owe to the dead, and a due regard for the feelings of their friends who survive, and the promotion of the public health and welfare, all require that the bodies of the dead should not be exhumed, except under circumstances of extreme exigency."

Sepulture of the dead has been regarded in all ages of the world as a religious rite, and the place where the remains of friends have been deposited is always esteemed as consecrated and hallowed. It is true that it was the pride of Diogenes and his disciples of the ancient school of cynics to regard burial with contempt, and to hold it utterly unimportant whether their bodies should be burned by fire, or devoured by beasts, birds, or worms; and some of the French philosophers of modern days have, in a kindred spirit, descanted upon the "glorious nothingness" of the grave, and that "nameless thing," a dead body; but the public sentiment and secular jurisprudence of civilized nations hold the grave and the dead body in higher and better regard. In France, even, the home of this school of modern philosophy, it has been adjudicated by her secular courts that the land where dead bodies are buried shall not be profaned by culture even of its surface, until the buried dead have mouldered into dust. Law of Burial, 4 Bradf. (N. Y.), Appendix, 528. Cemeteries, as sleeping places of the dead, have existed from the most remote periods. The Hebrews had their public burial grounds, and the Greeks, before they adopted the custom of burning their dead, had their "sleeping fields" for the sepulture of the dead. In all countries, both ancient and modern, except where cremation is the practice, the first care of the people has always been to select a place for the burial of their dead; and many of these burial places are immense. In all Christian countries, the practice of burial under and around churches has prevailed to a great extent, and the place of burial is often consecrated, in form, by ecclesiastical ceremonies. And the law of burial, in its relation to the place of interment and the protection of the dead body, has usually been considered as belonging to that class of topics falling under the consideration of the ecclesiastical courts. Tyler's American Ecclesiastical Law, Section 970.

2. DEAD BODIES: disinterment: controlling principle.

Most people look forward to the proper disposition of their remains, and it is natural that they should feel an anxiety on the subject. And the right of a person to provide by will for the disposition of his body has been generally recognized. By the canon law, a person had a right to direct his place of sepulture. According to the strict rules of the old common law, a dead man could have no rights, but it will soon be seen that they do at least have the right to be protected, and that the law will, towards that end, extend its protecting hand. *Pierce v. Proprietors of Swan Point Cemetery,* 10 R. I. 227 (14 Am. Rep. 667). By the civil law of ancient Rome, the charge of burial was first upon the person to whom it was delegated by the deceased; but a body once buried could not be removed, except by the permission, in Rome, of the pontifical college, and in the provinces, of the governor. Since we have no ecclesiastical courts in this country, it necessarily followed that matters involving the burial or disinterment of a dead body came under the supervision of the equity courts. *Pierce v. Proprietors of Swan Point Cemetery,* supra.

In the case of *Gardner v. Swan Point Cemetery,* 20 R. I. 646 (78 Am. St. 897), that court said:

"The principle of all the cases seems to be that the buried body shall remain undisturbed, and that the right and duty falls to the next of kin to see that its repose is duly protected."

The depositories of the dead have ever been respected by mankind, whether civilized or uncivilized. Most of the commonwealths, including our own, have made it a felony to unlawfully disinter a dead body or disturb the monument or ornamentation where the body rests; and, as expressed in the *Thompson* case, heretofore cited, a due respect for the memory of the dead and for the feelings of the living friends and relatives requires that, when a body is once interred, it shall so remain, unless extreme necessity demands its disinterment.

The evidence in the case shows that, when this difficulty arose, the trustees offered to return King his money that he had originally paid for the lot, and give him another lot in the cemetery. Taking all of these matters into consideration, we conclude that the equities of the case are with the defendant, and that the body of John Elder should not be removed from said lot. "Let it rest in peace."

We are not confronted with the question of what the liability is, if any, by way of damages in favor of King and against the association for having sold this lot the second time; but we do hold that, under the peculiar situation existing in this case, the equities are not with the plaintiff.

The district court having held otherwise, it was in error. —*Reversed*.

EVANS, C. J., and DE GRAFF, MORLING, and WAGNER, JJ., concur.