[No. B055379. Second Dist., Div. Two. June 10, 1992.]

ALCOR LIFE EXTENSION FOUNDATION, INC., et al., Plaintiffs and Respondents, v.
DAVID W. MITCHELL as Chief, etc., et al., Defendants and Appellants

## COUNSEL

Daniel E. Lungren, Attorney General, Charlton G. Holland, Assistant Attorney General, John H. Sanders and Y. Tammy Chung, Deputy Attorneys General, for Defendants and Appellants.

Garfield, Tepper, Ashworth & Epstein and David B. Epstein, for Plaintiffs and Respondents.

Constance M. Ettinger and H. Jackson Zinn as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**GATES, Acting P. J.**—Appealing from the judgment entered in favor of Alcor Life Extension Foundation, Inc. (Alcor), and two of its members, the Department of Health Services, its Office of the State Registrar and their respective heads (referred to collectively as DHS unless otherwise indicated), seek a determination from this court "that death certificates and disposition permits cannot be issued for bodies of persons who have designated Alcor as a donee pursuant to the Uniform Anatomical Gift Act [Health and Safety Code section 7150 et seq.] and have directed Alcor to store their bodies in cryonic suspension."

As set forth in Alcor's first amended complaint, "Cryonic suspension (also known as cryogenic suspension) is a process by which the legally dead but biologically viable body of a person who has been ill or injured is preserved at low temperatures until such time as medical science may be capable of reviving the person and implementing effective cure or treatment of the illness or injury. Since 1964, the practice of cryonic suspension has become widespread, with organizations formed in major cities to provide cryonic suspension for their members. The first reported cryonically suspended person has been maintained in that state since 1967."

The question here tendered is peculiarly unique and extremely narrow in scope and, hopefully, our affirmance of the challenged judgment will completely preclude this particular issue from arising again in the future. That is to say, we merely examine the propriety of the trial court's decision concerning DHS's recent actions which have resulted in the denial of death certificates (Health & Saf. Code, § 10375) and disposition permits (Health & Saf. Code, § 10376) to Alcor members who have been placed in cryonic suspension. Neither side contends these individuals are not legally dead (Health & Saf. Code, § 7180) and otherwise entitled to death certificates. Their conflict relates solely to the obtainment of disposition permits.

The trial court has expressed no opinion on the validity of cryonics or the manner in which it should be regulated, nor do we. The initial determination of such issues, at least in the absence of any conflict, is clearly an administrative or legislative function.

Even DHS, despite its determined efforts to render Alcor's operations illegal, asserts "this case is not an attempt to prohibit cryonic suspension

activity." In fact, until questioned by us, in both its opening and closing briefs, DHS expressed a willingness to grant Alcor all necessary documentation if it would but utilize subterfuge to disguise its actual structure and the true nature of its operations. By way of example, although subsequently recanted, DHS in its reply brief had stated: "[T]he Department has encouraged Alcor to obtain a license as a cemet[e]ry or mausoleum or appoint another entity, such as a research institute, hospital,. or physician, as the donee under the U.A.G.A. so that Alcor's members can have their bodies or body parts cryonically suspended legitimately. However, Alcor has refused to do so."

Turning to the specific contention at hand, section 10375 of the Health and Safety Code provides: "No person shall dispose of human remains unless (a) there has been obtained and filed with a local registrar a death certificate, as provided in chapter 5 (commencing with Section 10200) of this division [division 9, Vital Statistics], and (b) there has been obtained from a local registrar a permit for disposition."

Appellant Office of the State Registrar is charged with executing the state's vital statistic statutes (Health & Saf. Code, § 10000 et seq.), including those pertaining to disposition permits. (Health & Saf. Code, § 10375 et seq.) It also has supervisory power over local registrars to insure uniform compliance with the requirements of vital statistics laws. (Health & Saf. Code, § 10026.)

Health and Safety Code section 10376 identifies three permissible methods of treating human remains for the purpose of the disposition permit: interment in a cemetery; cremation; and burial at sea. Viewed merely semantically, under the Health and Safety Code's circular definitions (see Health & Saf. Code, §§ 7003, 7005, 7009, 7012, 7015) Alcor might possibly be said to be operating a mausoleum. However, such statutory language was aptly characterized in *Cemetery Board* v. *Telophase Society of America* (1978) 87 Cal.App.3d 847, 855 [151 Cal.Rptr. 248], as "virtually nonsensical," and neither party, albeit for different reasons, now wishes Alcor to be so considered.

DHS has also recognized "scientific use," a disposition associated with the Uniform Anatomical Gift Act as an additional means of legally dealing with human remains. An anatomical gift of all or part of an individual's body may be made to the following donees:

"(1) A hospital, physician, surgeon, or procurement organization, for transplantation, therapy, medical or dental education, research, or advancement of medical or dental science.

"(2) An accredited medical or dental school, college, or university for education, research, or advancement of medical or dental science.

"(3) A designated individual for transplantation or therapy needed by that individual." (Health & Saf. Code, § 7153, subd. (a).)

For a number of years Alcor was apparently permitted to operate under that act. However, in March 1988, the Chief of the Office of the State Registrar, David W. Mitchell, in a letter making explicit reference to Alcor, advised the Riverside County Coroner that burial permits may not be issued for cryonic suspension. Mitchell further admonished that state law provides for "storage" of a dead body only if it is used "for scientific purposes or qualifies as a gift under the Anatomical Gift Act" and pointed out that disposing of a dead body anywhere in the city or county, except within a cemetery, is a misdemeanor.

Three months later, in response to an inquiry from the Riverside County Department of Health, Mitchell stated if Alcor was storing bodies or body parts in its facility, it would be "guilty of a misdemeanor" and "should be reported to the local District Attorney for investigation and prosecution as appropriate."

Shortly thereafter, DHS, through its Office of the State Registrar and pursuant to its supervisory authority over local registrars, issued a "Handbook for Local Registrars of Birth and Death" which instructed local registrars that disposition of human remains by cryonic suspension does not constitute "scientific use" within the meaning of the Uniform Anatomical Gift Act. The 1990 version of this book, the most recent one available at the time the instant summary judgment motion was heard, similarly specified: "The holding of human bodies in cryonic suspension does not constitute the operation of a cemetery, nor does arranging to have one's body so placed meet the scientific use requirements of the Uniform Anatomical Gift Act."

The authority cited for this statement was 63 Ops.Atty.Gen. 879 (1980). In its representation of DHS on this appeal, the Attorney General still purports to rely upon that opinion despite making suggestions which are totally inconsistent with the views it expressed there. ■ Of course, such an opinion, even when correct, a debatable proposition here, would not be binding on this court. (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].)

DHS now advises that it subsequently has altered its posture, concluding "it does not have the authority to determine whether or not cryogenic suspension of dead bodies or body parts constitutes valid science research

and that such question should appropriately be decided by the Legislature." However, this shift in position does not aid Alcor since DHS refuses to recognize Alcor as a "procurement organization" for purposes of the Uniform Anatomical Gift Act, the donee category into which Alcor might possibly fit.

A procurement organization is defined as "a person licensed, accredited, or approved under the laws of any state or by the State Department of Health Services for procurement, distribution, or storage of human bodies or parts." (Health & Saf. Code, § 7150.1, subd. (j).)

█ DHS points out that Alcor has not been "licensed, accredited or approved" to function as a procurement organization, though obviously Alcor could not possibly have done so since DHS has not established any procedure or mechanism which would permit Alcor or any other organization even to make application therefor. DHS then announces its intention to await "further guidance from the Legislature prior to even considering Alcor as a possible procurement organization." It argues that Health and Safety Code section 7150.1 is merely a definitional provision.

Understandably, the trial court declined to accept this "catch-22" approach which exposes Alcor to potential criminal liability. Therefore, it "permanently enjoined and . . . ordered [DHS] to desist from prohibiting, instructing or directing against, or otherwise interfering with, the registration of deaths or the issuance of disposition permits for the bodies of persons who have designated Alcor as a donee pursuant to the Uniform Anatomical Gift Act (Health and Safety Code § 7150 et seq.) and who have directed that Alcor place their bodies in cryonic suspension, provided that . . . [i]n the event and at such time as [DHS] implement[s] an otherwise lawful licensing and registration system for procurement organizations pursuant to the Uniform Anatomical Gift Act, plaintiff Alcor will be subject to lawful and reasonable licensing and registration requirements."

Under the circumstances, particularly in the absence of any evidence that Alcor's operations pose an actual threat to the public health, we agree with the injunctive relief ordered by the trial court. We need not determine whether each of the court's individual findings was correct. It is enough that we agree DHS's sudden and unexplained about-face with respect to Alcor's status as a donee under the Uniform Anatomical Gift Act cannot be premised upon Alcor's failure to secure a license as a procurement organization when DHS has failed to establish a mechanism for obtaining such a license. Such conduct is, at the very least, inconsistent with DHS's basic duty to administer and enforce the statutes pertaining to the registration of death certificates and issuance of disposition permits.

In that regard, DHS frankly acknowledges that its "Office of the State Registrar [is] charged with the duty . . . of registering births, deaths, marriages, etc." but declares it is "at [a] loss as to how to register the status" of cryonically suspended persons without first receiving "specific guidance from the Legislature." However, like the trial court, we take a more sanguine view of appellants' abilities. In any event, if, in carrying out the trial court's mandate DHS proceeds in a fashion contrary to that envisioned by the Legislature because of the lack of statutory guidance, that body will no doubt take corrective action.

DHS also poses a number of what it characterizes as "serious questions," e.g.: "Should cryonically suspended people be considered 'dead' or should a separate category of 'suspended' people be created? How should such people be registered in official records? . . . [W]hat happens to the estate and the assets of the 'decedent' after the decedent is put in cryonic suspension? . . . [W]hat would happen to such estate and assets if and when cryonic suspension is successful and the decedent is restored to life? Whose identity is the person to assume or be assigned and what of the record of the person's death? Alcor also stores body parts, such as human heads and hands. In such cases, whose identity will the suspended heads and hands assume upon their restoration; the identity of the original owner of the body part or the identity of the new body to which the body part will be attached?"

These are, of course, but a few of the presently imaginable conundrums which could arise should Alcor at some future time actually succeed in reviving the currently dead. Nonetheless, we are confident that those persons who will then head our various branches of government will be far wiser than we and entirely capable of resolving such dilemmatic issues without our assistance.

The judgment is affirmed.

Nott, J., and Manella, J.,* concurred.

---

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.