**ALCOR LIFE EXTENSION FOUNDATION, Plaintiff–Appellant,**

v.

**David RICHARDSON and Darlene Broeker, Individually and Co–Administrators of the Estate of Orville Martin Richardson, Defendants–Appellees.**

No. 09–1255.

Court of Appeals of Iowa.

May 12, 2010.

William S. Vernon and Webb L. Wassmer of Simmons, Perrine, Moyer, Bergman, P.L.C., Cedar Rapids, for appellant.

Gerald D. Goddard and John D. Cray of Cray, Goddard, Miller, Taylor & Chelf, L.L.P., Burlington, for appellee.

Thomas D. Waterman and Wendy S. Meyer of Lane & Waterman, L.L.P., Davenport, for amicus curiae Iowa Donor Network.

Heard by VAITHESWARAN, P.J., and POTTERFIELD and MANSFIELD, JJ.

MANSFIELD, J.

This dispute over a decedent's remains raises significant issues under the Revised Uniform Anatomical Gift Act, the Final Disposition Act, and Iowa law pertaining to disinterments. *See* Iowa Code ch. 142C, ch. 144C, § 144.34 (2009). In 2004 Orville Richardson made arrangements with Alcor Life Extension Foundation to take possession of his remains and cryopreserve his head after he passed away. When Orville died in 2009, however, Orville's relatives did not notify Alcor and instead had him buried. Alcor now appeals the district court's denial of its request for an order compelling the relatives to sign an approval for the disinterment of Orville's body at Alcor's expense. For the reasons set forth herein, we reverse and remand.

## I. Background Facts and Proceedings.

Orville Richardson, born 1927, had a long career as a pharmacist in Burlington. Orville was married, but had no children, and his wife predeceased him. David Richardson and Darlene Broeker are Orville's brother and sister.

On June 1, 2004, Orville submitted a membership application to Alcor Life Extension Foundation. Alcor is a California nonprofit corporation registered as a tax exempt 501(c)(3) scientific organization engaged in the study and practice of cryonic suspension. Alcor defines cryonic suspension as "[t]he procedure of placing the bodies/brains of people who have been declared legally dead into storage at temperatures of -100°C or lower, with the hope that future medical development will allow the restoration of life and health." In the membership application, Orville chose a

method of suspension called "neurosuspension," wherein the member's brain or entire head is removed and cryopreserved.[1]

On December 15, 2004, Orville executed a series of documents authorizing Alcor to take possession of his remains upon his death so that his head and brain could undergo cryonic suspension. Among the documents was a "Last Will and Testament for Human Remains and Authorization of Anatomical Donation" made for "the purpose of furthering cryobiological and cryonic research." This document was signed in conjunction with a "Consent for Cryonic Suspension" and a "Cryonic Suspension Agreement," both of which stated the goal of cryonic suspension was "the hope of possible restoration to life and health at some time in the future." At the time he signed these documents, Orville paid Alcor a lump sum lifetime membership fee of $53,500.

Orville's 2004 "Last Will and Testament for Human Remains and Authorization of Anatomical Donation" specifically stated:

[I]n accordance with the laws governing anatomical donations, I hereby:

a) donate my human remains to the Alcor Life Extension Foundation, Inc. ("Alcor"), a California non-profit corporation, . . . such donation to take place immediately after my legal death, and

b) direct that upon my legal death my human remains be delivered to Alcor or its agents or representatives, at such place as they may direct.

In the fall of 2007, Orville was no longer capable of living independently due to the onset of dementia. Accordingly, in April 2008, David and Darlene filed a petition with the district court seeking appoint-

ment as Orville's co-conservators. Darlene also filed a separate petition requesting she be appointed as Orville's guardian. These petitions were granted by separate orders on May 5, 2008.

On May 27, 2008, David and Darlene wrote to Alcor informing it of their recent appointment as co-conservators of Orville, and requesting that Alcor reissue an uncashed check discovered in Orville's files.[2] As a result of the request, Alcor issued a replacement check to David and Darlene, the amount of which covered both that check and another uncashed check. The letter to David and Darlene enclosing the replacement check was written on Alcor letterhead, disclosing Alcor's full name, mission, address, website, officers, directors, and medical and scientific advisory boards.

Although it is unclear as to when, David and Darlene admitted that during Orville's lifetime, Orville discussed the subject of donating his brain or entire head for cryonic suspension. In their answer, David and Darlene state that they "tried to talk [Orville] out of such a plan and they emphatically told him they would have nothing to do with his plan." According to David and Darlene, Orville responded that he understood their position and the subject was never discussed thereafter. David and Darlene further assert in their answer that they never saw any contracts or agreements between Orville and Alcor, and that Orville never told them he had entered into such agreements.

Orville died intestate on February 19, 2009. The following day, David and Darlene were named co-administrators of Or-

---

1. According to the documentation, Orville's other remains would be cremated. Alcor would "retain or dispose of the cremated portion of the Member's remains . . . consistent with legal requirements. . . ."

2. Alcor issued periodic payments to Orville based on interest generated from his lump sum lifetime membership payment.

ville's estate. David and Darlene had Orville embalmed and then buried in Burlington on February 21, 2009.

On April 21, 2009, two months after Orville's burial, David wrote to Alcor requesting a refund of Orville's lifetime membership payment. The letter stated,

> Orville was my brother, and I'm aware he contracted with you several years back in the amount of approximately $50,000 to provide a potential service following his death.

> Orville obviously did not utilize this service, and accordingly we request a refund of all funds to the Estate of Orville Martin Richardson.

A week later Alcor responded, questioning why it was not notified of Orville's death so that it could follow Orville's wishes.

Alcor soon demanded Orville's remains. When David and Darlene refused, Alcor filed a motion in the probate court for an expedited hearing. Alcor argued that Orville had made an anatomical donation to Alcor and that David and Darlene had no right to revoke it. Specifically, Alcor maintained that the Revised Uniform Anatomical Gift Act applied to Orville's transaction with Alcor, that section 142C.3(5) of that Act prohibits revocation of such a gift by anyone other than the donor, and that section 142C.8(8) makes the rights of a procurement organization superior to the rights of all other persons. As a remedy, Alcor asked the district court to order David and Darlene to obtain a permit for the disinterment of Orville's body. Alcor offered to pay all expenses associated with the disinterment. Alcor conceded that

Iowa Code section 144.34 did not authorize the court to directly order disinterment, but argued the court could order Orville's brother and sister to execute an application for a disinterment permit with the Iowa Department of Public Health.

In their resistance, David and Darlene responded that they had no knowledge of the arrangement between Orville and Alcor and that Alcor had failed to contact them during Orville's lifetime despite its knowledge of their appointment as his co-conservators. They argued the transaction with Alcor was not covered by the Revised Uniform Anatomical Gift Act. In any event, they maintained that under the Final Disposition Act, Iowa Code § 144C.5(1)(f), they had the ultimate authority to dispose of Orville's remains.[3] David and Darlene further claimed that disinterment would be improper since it would not be for the purpose of autopsy or reburial.

The district court held a hearing on June 8, 2009. Arguments were presented, but no testimony was taken. In a June 15, 2009 ruling, the district court denied Alcor's requests for relief. The district court found the Final Disposition Act under Iowa Code chapter 144C to be controlling, and that Alcor could not qualify as a designee under the Act because Orville's declaration to Alcor was executed prior to the Act's effective date. Thus, the district court concluded that "David and Darlene were vested with the absolute right to control final disposition of Orville's remains after his death." The district court also agreed with David and Darlene that the disinterment statute did not apply in

---

**3.** Iowa Code section 144C.5(1) confers the "right to control final disposition of a decedent's remains" upon a list of persons in order. The person with the first priority is a "designee ... acting pursuant to the decedent's designation." *Id.* § 144C.5(1)(a). Thereafter, the rights pass to the decedent's

next of kin. *Id.* § 144C.5(1)(b)—(h). However, the "designation" provision applies only where the declaration was executed on or after July 1, 2008. *See* 2008 Iowa Acts ch. 1051, § 22. Accordingly, David and Darlene argued that they had the right to control final disposition of the body as Orville's next of kin.

any event because Alcor was not seeking autopsy or reburial. Additionally, the district court found that it did not have authority to order David and Darlene to execute an application for a disinterment permit. Alcor appeals.

## II. Issues on Appeal.

Four issues are raised on appeal: (1) whether Orville's arrangement with Alcor concerning the delivery of his body for cryonic suspension of his brain falls within Iowa's Revised Uniform Anatomical Gift Act; (2) whether Alcor, on the one hand, or David and Darlene, on the other, had the right to control the final disposition of Orville's remains; (3) whether a court has the authority to order David and Darlene to execute a consent to disinterment, assuming that Alcor prevailed on the first two issues; and (4) if so, whether the district court should have exercised that authority under the facts and circumstances of this case.

## III. Legal Principles Governing Our Review.

### A. Standard of Review.

This case was filed and tried in equity; therefore, our review is de novo. Iowa R.App. P. 6.907; *see also Life Investors Ins. Co. of Am. v. Heline*, 285 N.W.2d 31, 35–36 (Iowa 1979) (discussing the scope of review at some length and holding that disinterment actions are tried in equity and "reviewable de novo"). We examine the entire record and adjudicate rights anew on the issues properly presented. *Commercial Sav. Bank v. Hawkeye Fed. Sav. Bank*, 592 N.W.2d 321, 326 (Iowa 1999). While we give weight to the district court's factual findings, we are not bound by them. Iowa R.App. P. 6.904(3)(*g*). We note further that in this case, the parties did not present testimony or even affida-

vits. The motion was decided on the pleadings, the briefs, and the exhibits.

### B. Principles of Statutory Interpretation.

Our primary goal in interpreting a statute is to ascertain and give effect to the legislature's intent. *State v. Public Employment Relations Bd.*, 744 N.W.2d 357, 360 (Iowa 2008). In determining legislative intent, we consider not only the words used by the legislature, but also the statute's subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, and the consequences of various interpretations. *Thompson v. Kaczinski*, 774 N.W.2d 829, 833 (Iowa 2009). We assess a statute in its entirety, and look for a reasonable interpretation that best achieves the statute's purpose and avoids absurd results. *Schadendorf v. Snap–On Tools Corp.*, 757 N.W.2d 330, 338 (Iowa 2008).

■ Absent a statutory definition or an established meaning in the law, we give words their ordinary and common meaning by considering the context within which they are used. *Iowa Beta Chapter of Phi Delta Theta Fraternity v. State, Univ. of Iowa*, 763 N.W.2d 250, 260 (Iowa 2009). Where the legislature has not defined words of the statute, we may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage. *Bernau v. Iowa Dep't of Transp.*, 580 N.W.2d 757, 761 (Iowa 1998). In the absence of instructive Iowa legislative history, we also look to the comments and statements of purpose contained in Uniform Acts to guide our interpretation of a comparable provision in an Iowa Act. *In re Marriage of Shanks*, 758 N.W.2d 506, 512 (Iowa 2008).

■ Statutes relating to the same subject matter are to be considered in light of their common purposes and should

be harmonized. *State v. McKinney*, 756 N.W.2d 678 (Iowa 2008). "[W]hen two pertinent statutes cannot be harmonized, the court will apply the statute that deals with the subject 'in a more definite and minute way,' as opposed to a statute that 'deals with [the] subject in a general and comprehensive manner.'" *Maghee v. State*, 773 N.W.2d 228, 239–40 (Iowa 2009) (quoting *City of Des Moines v. City Dev. Bd.*, 633 N.W.2d 305, 311 (Iowa 2001)); *see also* Iowa Code § 4.7.

## IV. Analysis of the Issues Presented.

### A. Statutory History of the Uniform Anatomical Gift Acts.

The original Uniform Anatomical Gift Act was approved by the National Conference of Commissioners on Uniform State Laws (NCCUSL) in 1968. The 1968 Act was intended to "encourage the making of anatomical gifts" by eliminating uncertainty as to the legal liability of those authorizing and receiving anatomical gifts, while respecting dignified disposition of human remains. Prefatory Note to Unif. Anatomical Gift Act of 1968.

> The most significant contribution of the 1968 Act was to create a right to donate organs, eyes, and tissue. This right was not clearly recognized at common law. By creating this right, individuals became empowered to donate their parts or their loved one's parts to save or improve the lives of others.

Prefatory Note to Revised Unif. Anatomical Gift Act of 2006. The 1968 Act was adopted in all fifty states and the District of Columbia. Prefatory Note to Unif. Anatomical Gift Act of 1987.

By 1987, the introduction of new immunosuppressive drugs and improvements in surgical techniques for transplanting organs and tissues enhanced the capacity to perform transplants, thereby increasing the demand for organs. *Id.* Accordingly, it had become "apparent that the public policy instituted in 1969 (by promulgation of the Uniform Anatomical Gift Act in 1968) [was] not producing a sufficient supply of organs to meet the current or projected demand for them." *Id.* In addition, it was noted that although many Americans supported organ donation, very few actually participated in organ donation programs. *Id.* Therefore, NCCUSL decided to revise the 1968 Act. The proposed amendments were meant to "simplify the manner of making an anatomical gift and require that the intentions of a donor be followed." *Id.*

The 1987 revisions were adopted in only twenty-six states. Prefatory Note to Revised Unif. Anatomical Gift Act of 2006. As a result, the non-uniformity actually became a hindrance to the policy of encouraging donations. *Id.* Therefore, in 2006, NCCUSL again revised the Act. One of the major changes in the 2006 revision was the strengthening of the respect due to a donor's decision to make an anatomical gift. *Id.* While the 1987 revision provided that a donor's anatomical gift was "irrevocable," it was common practice for procurement organizations to seek affirmation from the donor's family. *Id.* The 2006 revision ended this practice. Specifically, the 2006 revision

> intentionally disempower[ed] families from making or revoking anatomical gifts in contravention of a donor's wishes. Thus, under the strengthened language of this [act], if a donor had made an anatomical gift, there is no reason to seek consent from the donor's family as they have no right to give it legally.

*Id.* The drafters noted the "possible tension between a donor's autonomous decision to be a donor with the interest of surviving family members," but decided it

was necessary to "favor[ ] the decision of the donor over the desires of the family." Revised Unif. Anatomical Gift Act of 2006 § 8 cmt. The drafters went on to specifically note:

This section does not affect property rights families might otherwise have in a decedent's body under other law, such as the right to dispose of a decedent's body after the part that was the subject of the anatomical gift has been recovered. In fact, language in Section 11(h) confirms the family's right to dispose of the donor's body after the donor's parts have been recovered for transplantation, therapy, research, or education.

*Id.*

### B. Iowa's Revised Uniform Anatomical Gift Act (RUAGA).

Iowa has adopted each of the promulgations of the Uniform Anatomical Gift Act. *See* 2007 Iowa Acts ch. 44 (enacting the 2006 revision); 1995 Iowa Acts ch. 39 (enacting the 1987 revision); 1969 Iowa Acts ch. 137 (enacting the original 1968 Act); *see also* Kristi L. Kielhorn, *Giving Life After Death: The 2006 Revision of the Uniform Anatomical Gift Act*, 56 Drake L.Rev. 809, 817–26 (Spring 2008) (discussing the Uniform Anatomical Gift Act in Iowa). The current RUAGA is codified in Iowa Code chapter 142C.

According to the RUAGA, "an anatomical gift of a donor's body or part may be made during the life of the donor for the purposes of transplantation, therapy, research, or education." Iowa Code § 142C.3(1). The donor may make an anatomical gift by will, *id.* § 142C.3(2)(a)(2), and the will "takes effect upon the donor's death whether or not the will is probated." *Id.* § 142C.3(2)(d). Once an anatomical gift is made by a donor, it is given preclusive effect. *Id.* § 142C.3(5). Accordingly, when a donor makes an anatomical gift or

amendment and no contrary indication by the donor is shown, "a person other than the donor is prohibited from making, amending, or revoking an anatomical gift of a donor's body or part." *Id.* § 142C.3(5)(a).

Anatomical gifts may be made to and received by several different persons, including "appropriate person[s] for research and education." *Id.* § 142C.5(1). If the anatomical gift appropriately passes to a person entitled to receive an anatomical gift, "the rights of a person to whom the part passes ... are superior to the rights of all other persons with respect to the part." *Id.* § 142C.8(8).

### C. Does the RUAGA Apply Here?

The RUAGA did not become effective in Iowa until July 1, 2007, three years after Orville had entered into his arrangements with Alcor. Nonetheless, both parties appear to concede that the 2006 Revised Act is the relevant law for us to consider. *See* Iowa Code § 142C.13 (indicating that chapter 142C is intended to be retroactive and stating, "This chapter applies to an anatomical gift, or amendment to, revocation of, or refusal to make an anatomical gift, whenever made.").

■ The parties initially focus on whether Alcor is an "appropriate person for research" such as to be able to receive anatomical gifts. *See* Iowa Code § 142C.5(1)(a) (stating that an anatomical gift may be made to a "hospital, accredited medical or osteopathic medical school, dental school, college, or university, organ procurement organization, or other appropriate person for research or education"). In *Alcor Life Extension Found., Inc. v. Mitchell*, 7 Cal.App.4th 1287, 1292, 9 Cal. Rptr.2d 572 (1992), the California Court of Appeal held that Alcor could receive bodies under the Uniform Anatomical Gift Act as it then existed. This is the only report-

ed decision of which we are aware involving Alcor or cryonic suspension. There, Alcor did not have a license from California to function as a "procurement organization," the donee category into which Alcor sought classification. The California Uniform Anatomical Gift Act at that time required any recipient that was a "procurement organization" to be "licensed, accredited, or approved" under state law. However, the court affirmed the trial court's injunction in favor of Alcor and against the State of California based on the particular facts of that case. California had previously allowed post-mortem transfers of bodies to Alcor, but then made a "sudden and unexplained about-face with respect to Alcor's status," and failed to establish procedures for Alcor to become such a "procurement organization," thus placing Alcor in an untenable "catch–22." *Id.*

In the present case, though, Alcor does not argue that it qualifies as an "organ procurement organization," we presume because this now requires a designation by the *federal* government, which we assume Alcor does not have. *See* Iowa Code § 142C.2(20). Instead, as noted, Alcor maintains that it is an "other appropriate person for research." *Id.* § 142C.5(1)(a).

From the record before us, which includes the Internal Revenue Service's determination that Alcor qualifies for tax-exempt status under 26 U.S.C. § 501(c)(3), as well as documents indicating Alcor's bona fides as an organization engaged in research in cryopreservation, we believe that Alcor meets the definition of an "appropriate person for research." *See* Revised Unif. Anatomical Gift Act of 2006 § 11 cmt. ("[A]n anatomical gift of a body for research or education can be made to a named organization. These gifts typically occur as the result of a whole body donation to a particular insti-

tution in the donor's will or as the result of a prior arrangement between a donor and a particular research or educational institution.").

■ However, as we see it, another key inquiry presented by this case is whether a transaction whereby an individual *pays* an organization for the future cryonic suspension of his body or body part constitutes an "anatomical gift" so as to implicate the RUAGA. This particular question was not raised by the parties or addressed by the district court. Therefore, we question whether it was preserved for our review. Nonetheless, because it is subsumed within the larger issue of whether RUAGA applies, we will address it.

In the classic situation covered by the RUAGA, of course, the organ donor is engaged in pure altruism. He or she receives no satisfaction other than the knowledge that he or she is providing either the "gift of life" to an unknown third party or a specimen for medical research. Here, the transaction involved a payment from Orville and services to be rendered in return by Alcor. To the outside observer, it looks like a bargained-for contract.

■ An "anatomical gift" is defined as "a donation of all or part of the human body effective after the donor's death, for the purposes of transplantation, therapy, research, or education." Iowa Code § 142C.2(3). As the plain language states, a person must be making a donation or gift. Normally, to meet the requirements of a gift in Iowa, there must be (1) donative intent, (2) delivery, and (3) acceptance. *Gray v. Roth*, 438 N.W.2d 25, 29 (Iowa Ct.App.1989). The intent of the grantor is the controlling element. *Id.* Section 142C.6 of the RUAGA supersedes the common law principle that a gift requires delivery to be effective. *See* Iowa Code § 142C.6 ("A document of gift does not require delivery during the donor's life-

time to be effective."). However, the RUAGA does not by its terms displace the common law principles regarding donative intent. *See* Restatement (Third) of Prop.: Wills & Other Donative Transfers § 6.1 cmt.b. (2003) (discussing donative intent and noting that "[t]he relevant criterion is intent to transfer an ownership interest gratuitously, as opposed to engaging in an exchange transaction or making an involuntary transfer"); Melvin Aron Eisenberg, *The World of Contract and the World of Gift*, 85 Cal. L.Rev. 821, 842 (1997) ("[W]hat is the difference between gifts and bargains? The answer is that a bargain involves a transfer that is expressly conditioned on a reciprocal exchange, so that each party is entitled by the terms of the bargain to a compensatory reciprocal performance....").

Orville's intent is reflected in the documents he executed with Alcor. Based upon these documents, one might argue that Orville lacked the necessary donative intent to make a gift. The documents are referred to collectively as an "Agreement" and there are obligations on both sides. The documents reveal that Orville's motivation was the possibility of being restored in the future to life and health. Alcor agreed to undertake certain tasks toward that end. Alcor was paid to undertake those tasks. We note also that the 2006 version of the Uniform Act was proposed so that individuals would be "empowered to donate their parts or their loved one's parts *to save or improve the lives of others.*" Prefatory Note to Unif. Anatomical Gift Act of 2006 (emphasis added).

■ Thus, we have some concerns whether the transaction between Orville and Alcor falls within the statutory definition of an "anatomical gift." However, we conclude here that a transaction where the putative donor compensates a qualified donee for preserving all or part of the donated body does not take the transaction outside the scope of the RUAGA, even if in a strict common-law sense it may not qualify as a "gift." We reach this conclusion for several reasons. First, we note that the documents executed by Orville characterize the arrangement as an "anatomical donation" and state that he has "made this donation for the purpose of furthering cryobiological and cryonic research." These statements are entitled to some deference. *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 667 (Iowa 2008) (Appel, J., concurring specially) (observing in a different context that the "parties themselves are allowed to structure their legal relationships as they see fit, not as the court may wish"). Second, we note that section 142C.10 of the RUAGA, which generally prohibits the sale or purchase of body parts, allows "reasonable payment" for the "preservation" or "disposal" of a part. While this language is not directly on point, it suggests that paying for preservation of part or all of a body is not enough to place a transaction outside the RUAGA that otherwise would fall within its terms. Third, whenever an exchange transaction is not regarded as a gift, it is almost invariably because the putative donor received compensation in return, not because the donor provided the donee with something in addition to the gift. *See Kirchner v. Lenz*, 114 Iowa 527, 530, 87 N.W. 497, 498 (1901) (defining a gift as "any piece of property which is voluntary transferred by one person to another without compensation"). Nonetheless, for the future, we agree with certain commentators that legislative clarification would be beneficial in this area. *See generally* Adam A. Perlin, *"To Die in Order to Live": The Need for Legislation Governing Post–Mortem Cryonic Suspension*, 36 Sw. U. L. Rev. 33, 52 (2007) (noting uncertainty surrounding the status of cryonic suspension under the 1968 and 1987 ver-

sions of the Uniform Anatomical Gift Act: "Although by its terms the UAGA ... seems to plausibly encompass cryonics institutes, it is highly debatable whether this interpretation is the one that will prevail.").

## D. Interaction Between the RUAGA and the Final Disposition Act.

■ In addition to the RUAGA, Iowa also recently adopted the Final Disposition Act. *See* 2008 Iowa Acts ch. 1051. This Act responds to a perceived need for clarity as to who will determine the disposition of a decedent's remains. *See* Ann M. Murphy, *Please Don't Bury Me Down in That Cold Cold Ground: The Need for Uniform Laws on the Disposition of Human Remains*, 15 Elder L.J. 381, 400–01 (2007). Iowa's Act establishes a series of priorities. A designee acting pursuant to the "decedent's declaration" has the highest priority. Iowa Code § 144C.5(1)(a). However, if there is no designee, the decision falls to the decedent's next of kin. *Id.* § 144C.5(1)(b)—(h).

■ David and Darlene argue, and the district court found, that Orville did not execute a declaration covered by the Final Disposition Act, because a valid declaration must be executed on or after the law's effective date of July 1, 2008. *See* 2008 Iowa Acts ch. 1051, § 22. Therefore, they contend that, as his next of kin, they had the right to dispose of his remains as they saw fit. However, this argument only goes so far, because it does not address whether the RUAGA or the Final Disposi-

tion Act prevails in the event of a conflict between the two. We agree with Alcor that the legislature resolved such conflicts in favor of the RUAGA. First, the RUAGA expressly provides that "the rights of a person to whom a part passes under section 142C.5 are superior to the rights of all other persons with respect to the part." *Id.* § 142C.8(8). Furthermore, the Final Disposition Act directly gives precedence to the RUAGA. Iowa Code section 144C.10(4) states, "The rights of a donee created by an anatomical gift pursuant to section 142C.11[4] are superior to the· authority of a designee under a declaration executed pursuant to this chapter." Since a valid designee would have the highest priority conferred by the Final Disposition Act, this provision effectively reinforces that rights under the RUAGA take precedence over rights under the Final Disposition Act. Thus, we conclude that the rights of Alcor as a donee of an anatomical gift under the RUAGA are superior to David and Darlene's dispositional rights conferred by the Final Disposition Act.

## E. The Disinterment Statute.

This leads us to the third issue presented in this case. Assuming that Orville's transaction with Alcor qualifies as an anatomical gift, and that the burial of Orville's body was therefore in derogation of Alcor's rights, what should be done now? The district court found that even if David and Darlene did not have absolute authority to control the disposition of Orville's remains,

---

4. Iowa Code section 142C.11 is the right chapter but the wrong section. The rights of an anatomical gift donee are established by Iowa Code sections 142C.3 and 142C.5, not 142C.11 which concerns immunity. However, we have the power to judicially construe legislative enactments to correct inadvertent clerical errors that frustrate obvious legislative intent. *State v. Dann*, 591 N.W.2d 635, 639 (Iowa 1999) (also citing cases). We exercise that authority here. We note also that the legislature rectified the error this past session, and section 144C.10(4) now states, "The rights of a donee created by an anatomical gift pursuant to chapter 142C are superior to the authority of a designee under a declaration executed pursuant to this chapter." *See* Iowa Legis. Serv. S.F. 2138 (West 2010).

Alcor could not compel them to seek a disinterment permit.

Iowa Code section 144.34 provides two methods by which a person may disinter remains: (1) state-issued permit; and (2) court order. *Stark v. Stark*, 738 N.W.2d 625, 627 (Iowa 2007). Alcor concedes that the present circumstances do not meet the statutory criteria for court-ordered disinterment. Instead, Alcor argues that David and Darlene should have been compelled to apply for a disinterment permit. However, a state-issued permit still requires that the purpose of the disinterment be for "autopsy or reburial only." Iowa Code § 144.34.[5] The district court concluded that Alcor intended neither to perform an autopsy nor to rebury Orville.

■ Alcor contends that cryonic suspension of Orville's head and the cremation of the rest of his body would constitute a "reburial." This term is not defined in the statute or the implementing regulations. However, Iowa Administrative Code rule 641–101.7(1) provides, "Disinterment permits shall be required for any relocation (above or below ground) of a body from its original site of interment." According to Alcor, this language means that an above-ground relocation can constitute a reburial.

■ However, saying that an above-ground relocation *can* constitute a reburial does not mean that in all cases it *does* constitute a reburial. Nonetheless, we believe that rule 641–101.7(1)[6] compels us to adopt a broad construction of the term "reburial," as not limited to the situation where the decedent's remains would be placed into the earth. Otherwise, for example, Iowa law would forbid the disinterment of a body to place it in a mausoleum or to allow the scattering of the decedent's ashes in accordance with the decedent's wishes, an outcome that we think the legislature clearly did not envision. Even here, David and Darlene do not appear to dispute that Alcor's intended cremation of Orville's *body* in accordance with Orville's instructions would constitute a "reburial" of that portion of his remains. Simply stated, we believe the legislature used the term "reburial" in section 144.34 as convenient way to refer to any lawful, permanent disposition of the decedent's remains. The legislature was using the word "reburial" not to mandate that the final destination of the decedent's remains would be somewhere in the ground, but to insure that the decedent's remains would not be exhumed for a less important purpose, such as to remove jewelry with which the decedent had been buried. For these reasons, we conclude that the long-term cryonic suspension of Orville's head and the cremation of the rest of his body in accordance with his wishes would constitute a "reburial" within the meaning of section 144.34.

■ Other than disputing that the result would be a "reburial," David and Darlene do not specifically argue that an injunction requiring them to sign an application for disinterment would violate Iowa Code section 144.34. However, the district court found that Alcor's requested injunction would violate section 144.34 for an additional reason. In the court's view,

5. Consistent with section 144.34, the Iowa Department of Public Health application form for disinterment requires the applicant to indicate whether the disinterment is for autopsy or reburial.

6. Iowa Code section 144.34 authorizes the State Registrar of Vital Statistics to adopt rules governing disinterment, so this is a situation where authority to interpret the law has "clearly been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(*l*). We should defer to that interpretation unless it is "irrational, illogical, or wholly unjustifiable." *Id.*

"Consent that is forced or compelled by Court Order is not consent. Compelled consent is a non sequitur." Thus, the court concluded that it lacked authority to order David and Darlene to execute a consent to disinterment. *See Stark,* 738 N.W.2d at 628 ("Section 144.34 allows anyone to apply to DPH for a permit to disinter. However, the state registrar will only grant such applications with the consent of the surviving spouse or, in the absence of a surviving spouse, the next of kin.").

We respectfully disagree with the proposition that a court of equity lacks jurisdiction to order a party, in the appropriate circumstances, to execute a "consent" or "approval." Equity courts require parties to sign instruments all the time. *See, e.g., Calbreath v. Borchert,* 248 Iowa 491, 81 N.W.2d 433, 437 (Iowa 1957) (ordering parties to sign a deed). Equity courts also have the ability to tailor their remedies as needed. *See, e.g., Presto–X–Co. v. Ewing,* 442 N.W.2d 85, 89–90 (Iowa 1989) (holding that an injunction could be entered beyond the original expiration date of a restrictive covenant). This is not to say that a court of equity may rewrite section 144.34. As previously noted, that section provides two methods by which a person may obtain disinterment—(1) court order, or (2) consent of the person authorized to control the decedent's remains under section 144C.5. Iowa Code § 144.34; *see also Stark,* 738 N.W.2d at 627.[7] The second method should not ordinarily be viewed as a way to expand the scope of the first method. However, where the next of kin of a decedent engage in conduct for which disinterment is an otherwise appropriate remedy, we do not believe section 144.34

forecloses a court order compelling the same next of kin to execute a consent.

Section 144.34 also requires that "[d]ue consideration shall be given to the public health, the dead, and the feelings of relatives." These have been described as "caveats, in effect, admonishing courts that, when ruling in disinterment cases, they must not disregard certain special considerations attending such unique and sensitive subject matters." *Life Investors Ins. Co. of Am. v. Heline,* 285 N.W.2d 31, 35 (Iowa 1979). We are unaware of any public health issues presented here. The wishes of the "dead," i.e., Orville, would favor disinterment while those of the "relatives" do not. These caveats, in and of themselves, neither compel nor foreclose disinterment.

### F. Mandatory Injunction?

Finally, we must confront the question whether a mandatory injunction should issue against David and Darlene under the specific circumstances of this case, where we have already concluded that their actions were in derogation of Alcor's rights. Alcor concedes that mandatory injunctions, which compel an affirmative act, are looked upon with disfavor. *Iowa Natural Res. Council v. Van Zee,* 261 Iowa 1287, 158 N.W.2d 111, 115 (Iowa 1968). The decision to issue such an injunction is based upon the traditional principles of equity and the specific circumstances of the case, although the remedy is an extraordinary one that is granted with caution. *Nichols v. City of Evansdale,* 687 N.W.2d 562, 572 (Iowa 2004). We consider the relative equities of the parties, and whether the only effective remedy is injunctive relief. *United Properties, Inc. v.*

---

7. When the Final Disposition Act was adopted in 2008, the disinterment statute was amended to substitute the "person authorized to control the decedent's remains under section 144C.5" for the "surviving spouse or in case of such spouse's absence, death, or incapacity, the next of kin." 2008 Iowa Acts ch. 1051, § 2.

*Walsmith*, 312 N.W.2d 66, 74–75 (Iowa Ct.App.1981). Because the district court believed (incorrectly, in our view) that Iowa Code sections 144C.5(1) and 144.34 barred Alcor's claim, it did not weigh the factors relevant to mandatory injunctive relief. Each side, however, now urges various reasons why mandatory injunctive relief would or would not be appropriate. "[E]xhumation and removal of remains is in the United States a well-recognized province of equity." *Life Investors*, 285 N.W.2d at 35.

Ultimately, after weighing the "delicate considerations" in this case, see *id.*, we conclude that an injunction should have been granted based on the record made before the district court.[8] We believe the equities strongly favor Alcor, and the only effective remedy is injunctive relief. In that regard, we note the following.

First and foremost, Orville clearly wanted to undergo cryonic suspension, and our state historically has ranked the decedent's preferences highly. *Thompson v. Deeds*, 93 Iowa 228, 231, 61 N.W. 842, 843 (1895) ("[I]t always has been, and will ever continue to be, the duty of courts to see to it that the expressed wish of one, as to his final resting place, shall, so far as it is possible, be carried out."). Even under the Final Disposition Act, had there been no RUAGA, Orville's written and signed instructions would have prevailed but for the fairly technical point that they were executed before the Final Disposition Act came into effect.[9] In fact, this lawsuit would not have even been necessary but for the same technical point that Orville's written and signed instructions were executed before the effective date of the Act rather than afterward.[10] We believe equity lies with the party that intends to carry out Orville's wishes.

Second, Alcor has no adequate remedy at law. There is no substitute for Orville's remains. David and Darlene argue that Alcor's "remedy" may be to keep the approximately $50,000 it received (although they previously asked Alcor to return those funds). Alternatively, David and Darlene argue that transfer of Orville's remains to Alcor at this point would be a "meaningless act," given the amount of time they have already been in the ground, and the unlikelihood that cryonic preservation could ever be successful. However,

8. As we previously noted, no testimony was taken in the district court, and therefore we are reviewing the same written record as it did.

9. Also, before either the RUAGA and the Final Disposition Act were enacted, it appears that the common law would have allowed Orville to direct the disposition of his body. *See King v. Frame*, 204 Iowa 1074, 1079, 216 N.W. 630, 632 (1927) ("[T]he right of a person to provide by will for the disposition of his body has been generally recognized."). Thus, David and Darlene's legal position ultimately rests on the following unlikely confluence of factors: (1) the RUAGA does not apply; (2) most of the Final Disposition Act applies because Orville died after the effective date of the Act; but (3) section 144C.5(1)(a) of the Final Disposition Act does not apply because Orville's declaration was executed before the effective date of the Act. *See Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 736 (Iowa 1983) ("Equity regards substance over form and disregards technicalities to prevent injustice.").

10. If Orville's documentation with Alcor had been executed after July 1, 2008, Alcor would have been "the person authorized to control the decedent's remains under section 144C.5" and thus could have consented on its own to exhumation of Orville's remains. *See* Iowa Code § 144.34. No court intervention would have been necessary. *Stark*, 738 N.W.2d at 628 (holding that a district court may not block disinterment when the appropriate party consents to it and the disinterment is for purposes of autopsy or reburial, regardless of the "motives for reburial or the objections of other family members or friends").

the problem with both arguments is that our legal tradition considers human remains very special and unique, regardless of their worldly value. As the supreme court said many years ago:

It is true that it was the pride of Diogenes and his disciples of the ancient school of Cynics to regard burial with contempt, and to hold it utterly unimportant whether their bodies should be burned by fire, or devoured by beasts, birds, or worms, and some of the French philosophers of modern days have, in a kindred spirit, descanted upon the "glorious nothingness" of the grave, and that "nameless thing," a dead body, but the public sentiment and secular jurisprudence of civilized nations hold the grave and the dead body in higher and better regard.

*King v. Frame*, 204 Iowa 1074, 1078, 216 N.W. 630, 632 (1927). We quote this passage not to suggest that David and Darlene attach less importance to the remains of their sibling than Alcor does. Rather, our point is simply that if the equities strongly favor one side in a dispute over human remains, as we believe they do, it is not a sufficient response to argue that an adequate remedy at law exists.

Third, the record indicates David and Darlene knew of Orville's decision to entrust his remains to Alcor at the time they arranged for burial, notwithstanding their assertion that they had not seen a contract between Alcor and Orville. David and Darlene admit in their unverified answer that "during his lifetime" they were "advised by Orville he wanted his head severed and frozen." It is further undisputed that during the conservatorship, David and Darlene corresponded with Alcor and received a substantial replacement check from it. The check was accompanied by a letter that would have put David and Darlene on notice as to the nature of this entity, i.e., that Alcor had entered into a financial arrangement with Orville. Given the size of the check (nearly $5000), we find it implausible that David and Darlene would have paid no attention to the identity of the party that issued it and its reasons for doing so. It would have been part of their job as co-conservators to inform themselves as to Orville's affairs. *See* Iowa Code § 633.641 ("It is the duty of the conservator of the estate to protect and preserve it, to invest it prudently, [and] to account for it as herein provided . . ."); *In re Brubaker's Guardianship*, 214 Iowa 413, 239 N.W. 536, 537–38 (1931) ("It is the guardian's duty to give his personal care and attention to the management of his ward's estate, and [he] is bound to exercise therein such diligence and prudence as a reasonably prudent person ordinarily employs in the conduct of his own affairs.").

Also, by April 21, 2009, two months after Orville's burial, David and Darlene indisputably knew of the entire arrangement between Orville and Alcor, since they wrote seeking a refund of the "approximately $50,000" Orville had paid for a "potential service." David and Darlene are noticeably silent as to when and how they acquired this information.

In short, from the record before us, we conclude that David and Darlene decided to bury Orville despite knowledge he had made different arrangements for his remains. This in our view tips the equities further in Alcor's favor. Had David and Darlene notified Alcor at the time of Orville's death, and allowed this dispute to be resolved at that time, the practical difficulties in this case would not exist. Alcor would not be seeking a mandatory injunction forcing David and Darlene "to sign an Application they find abhorrent"; indeed, disinterment would be unnecessary. It seems unfair and inequitable, in our view, for David and Darlene to rely on obstacles to injunctive relief that exist only because of their own efforts to create a fait accompli.

David and Darlene implicitly concede that "who knew what and when?" is relevant, because they fault Alcor for not advising them of Orville's instructions for his remains. The implication is that if they had known of those arrangements, this might be a different case. We agree that "who knew what and when?" is relevant, but draw a different conclusion from this record. Alcor had no way of knowing that Orville had died or that his relatives were having him buried. By contrast, on this record, we find that David and Darlene were aware of Orville's having made a plan for disposition of his remains with Alcor.

A fourth factor we have already noted is the technical nature of David and Darlene's defense. Ordinarily, if an individual had executed Alcor's documents, but relatives had then buried the individual's body following his/her death, Alcor could sign the application for permit for disinterment on its own, and would not need assistance from the court. However, in this case, even though Orville died after July 1, 2008, he signed the declaration before then, rendering section 144C.5(1)(a) inapplicable. *See Bump*, 336 N.W.2d at 736 ("Equity regards substance over form and disregards technicalities to prevent injustice."). In short, David and Darlene's defense is predicated on what might be regarded as an accident of timing.

David and Darlene argue that Alcor's request for relief is moot, but we are not persuaded. Their claim of mootness is based on the amount of time that Orville's remains already have been in the ground. David and Darlene contend that the additional deterioration makes it even more speculative that Orville could ever be brought back to life. We cannot say, however, that this case is moot, without making scientific and philosophical judgments we are not prepared to make. If this were an ordinary proceeding for reburial in accordance with the testator's wishes, it would not be moot because of the time elapsed since the initial burial. As the supreme court has said in a somewhat different context, "[T]ime limitation for requesting disinterment is a policy question for the legislature, not the courts." *Life Investors*, 285 N.W.2d at 33.

Based on the foregoing considerations, and the specific facts of this case, we conclude that Alcor was entitled to its requested mandatory injunction directing David and Darlene to execute the application for a disinterment permit, with Alcor bearing all the burden and expense of disinterment. Despite the novelty of cryogenics, and the statutory complexity involved in this case, we believe this outcome is largely dictated by two longstanding and relatively straightforward traditions: first, our historic deference to the testator's wishes regarding the method and location of burial; and, second, the ability of courts of equity to fashion a suitable remedy when one party has violated another's rights. *See Pittman v. Magic City Mem. Co.*, 985 So.2d 156, 159–60 (La.Ct.App. 2008) (upholding trial court's decision to grant live-in girlfriend's request to exhume and relocate the decedent's remains based on the decedent's testamentary instructions that had been ignored by decedent's family members; the court emphasized that the girlfriend did not consent to the initial interment and objected to it as soon as she became aware of it).

We reverse and remand for entry of an order directing David Richardson and Darlene Broeker to execute an approval of the application for disinterment, and for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**