**STATE of Iowa ex rel. Thomas J. MILLER, Attorney General of Iowa, and Iowa Department of Natural Resources, Appellees,**

v.

**Austin J. DeCOSTER d/b/a DeCoster Farms of Iowa, Appellant.**

No.  98–294.

Supreme Court of Iowa.

March 22, 2000.

William Sidney Smith and Michael P. Mallaney of Smith, Schneider, Stiles, Hudson, Serangeli, Mallaney & Shindler, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and David R. Sheridan and Michael H. Smith, Assistant Attorneys General, for appellees.

Considered by McGIVERIN, C.J., and CARTER, NEUMAN, and CADY, JJ., and HARRIS,* S.J.

NEUMAN, Justice.

This is an environmental enforcement action brought by the State of Iowa against Austin J. DeCoster d/b/a DeCoster Farms of Iowa. The action concerns two hog manure spills at DeCoster confinement facilities, one occurring in Wright County and the other in Hamilton County. Although not major in scope, the violations came on the heels of other administrative actions and legal proceedings against this large-scale livestock producer.

The focus of this appeal by DeCoster is not on the trial court's ultimate finding that the violations occurred and justify the $10,000 penalty ($5,000 per site) stipulated by the parties. Rather, DeCoster contests the method by which the matters came before the court. This case involves "referrals" by the Environmental Protection Commission (hereinafter "EPC" or "commission") to the attorney general pursuant to Iowa Code section 455B.191(4) (1997). A referral is distinguished from violations handled administratively by the EPC, *see* Iowa Code § 455B.191(1), or initiated directly by the attorney general, *see id.* § 455B.112, by the fact that referral actions carry greater consequences. A referral that results in a district court judgment and court-imposed penalty may qualify as a "strike" for purposes of classifying a producer with three strikes as an

"habitual violator." *See id.* § 455B.191(7). Once classified as an habitual violator, a producer cannot obtain construction permits for five years and is subjected to greater agency supervision and higher penalties for further violations. *Id.* § 455B.191(4).

DeCoster claims he has been singled out for harsher treatment because of the size of his operation and publicity surrounding it. Unable to successfully contest the violations on their merits, he has challenged (1) the nature of the action before the Environmental Protection Commission, (2) the membership of that commission, (3) the criteria (or lack thereof) underlying the commission's referral to the attorney general, (4) alleged procedural defects in the commission's action, and (5) the trial court's refusal to permit DeCoster's counsel to examine commission members concerning their referral decision. DeCoster also assails the court's dismissal of his counterclaim for declaratory relief, and the court's finding that the statutes at issue hold the violator strictly liable for waste that is discharged into the state's watercourses.

Finding no merit in any of DeCoster's contentions, we affirm the judgment of the district court.

## I. Background Facts and Proceedings.

In early May 1996, employees of the Department of Natural Resources (DNR) discovered liquid hog waste discharging into a drainage ditch in Wright County. The source of the pollution was an old tile line carrying subsurface leakage from the anaerobic lagoon at the DeCoster facility known as Nursery Unit # 3. Sewage fungus growing downstream from the tile indicated a longstanding problem with leakage. Once notified of the problem, DeCoster employees took prompt action to repair the broken tile.

---

* Senior judge assigned by order pursuant to Iowa Code section 602 .9206 (1999).

Following the DNR discovery at Nursery Unit #3, then-Governor Terry Branstad declared on a radio talk show that he was going to "shut down" DeCoster Farms. His radio announcement was followed by a press release which stated the governor had directed the DNR to put a hold on new construction permits for DeCoster and to "freeze" any expansion of his facilities. The record reveals that, irrespective of the governor's declaration, the DNR had been without authority for some time to permit expansion of DeCoster facilities because of a pending enforcement action. *See* Iowa Code § 455B.173.

In July 1996, the incident at Nursery Unit #3 was brought before the EPC for possible referral to the attorney general for legal proceedings in accordance with Iowa Code section 455B.191(4). On a four-to-four vote, the commission declined to refer the matter for enforcement. A month later EPC administrator, Allan Stokes, placed the matter back on the commission's agenda. In the meantime, two members had resigned from the commission. They were replaced by two new gubernatorial appointees who assumed their responsibilities subject to later confirmation by the Iowa Senate. On reconsideration, the commission voted nine-to-zero to refer the Nursery Unit #3 violation to the attorney general for judicial enforcement action.

In November 1996, a local farmer reported to a Hamilton County sheriff's deputy that a DeCoster employee was over-applying liquid hog manure on frozen farm ground near a DeCoster facility called Sow Unit #1. Inspection by DNR officials revealed brownish water with a scum and odor indicative of manure flowing into a ditch along the roadside. DeCoster personnel were at the scene, trying to stop the runoff by roughing up the soil to increase absorption but the soil was too frozen. The employees had been aware of

the discharge but continued surface application of the manure.

The incident at Sow Unit #1 came before the EPC in January 1997. Counsel for DeCoster appeared at the meeting, as he had in connection with Nursery Unit #3, to argue against referral. The commission voted seven-to-two to refer this violation to the attorney general for judicial enforcement.

The State then filed petitions in district court seeking civil penalties for the violations just described.[1] In answer to the petitions, which were eventually consolidated, DeCoster responded with a general denial and counterclaim for declaratory judgment. His counterclaim sought a ruling from the court rejecting any notion that the nature of the violations covered by the lawsuit would give rise to an habitual violator classification within the meaning of Iowa Code section 455B.191(7).

The parties thereafter filed cross-motions for partial summary judgment. The district court rejected DeCoster's allegation that the two newest EPC members improperly participated in the referral votes and that the commission, in reconsidering the violation at Nursery Unit #3, violated its own parliamentary rules of order. The court granted the State's motion for partial summary judgment, finding DeCoster strictly liable for discharging hog waste into waters of the state. It also dismissed, as premature and not within the purview of this action, DeCoster's counterclaim concerning habitual violator status.

The case proceeded to trial on DeCoster's procedural challenges to the EPC referrals. He argued the referrals were the product of discrimination and selective enforcement. From judgment for the State on both violations, DeCoster now appeals.

## II. Scope of Review.

■ This case reaches us on appeal from rulings on the parties' cross-motions

1. The petitions also sought injunctive relief and alleged a further violation at Finishing Unit #1 involving inadequate freeboard in an

earthen waste storage basin. The State later dismissed its request for injunction and the freeboard violation is not before us on appeal.

for summary judgment, as well as the judgment entered following trial of the remaining issues to the court. The case was tried at law. To the extent the parties' disagreement centers on the court's application of the law to undisputed facts, our review is for the correction of legal error. *Goodell v. Humboldt County*, 575 N.W.2d 486, 491 (Iowa 1998). Fact findings by the district court are binding on appeal if supported by substantial evidence. Iowa R.App. P. 14(f)(1).

### III. Issues on Appeal.

■ A. *"Other agency action" or "contested case proceeding."* DeCoster asserts at the outset that the trial court erred when it characterized the proceeding before the EPC as "other agency action," thereby rejecting DeCoster's belated claim of entitlement to a full evidentiary hearing preliminary to referral by the agency to the attorney general for enforcement. The State, mindful that the court rejected DeCoster's argument on the merits, nevertheless insists the issue was waived, and need not have been addressed by the court, because DeCoster failed to raise it before the EPC. The State's waiver argument is correct.

■ Generally, issues must first be presented to the agency in order to be preserved for appellate review. *City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 534 (Iowa 1996); *Fisher v. Board of Optometry Exam'rs*, 478 N.W.2d 609, 611 (Iowa 1991); *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 382 (Iowa 1986). Although counsel for DeCoster appeared before the commission and argued vigorously against referral, nowhere does the record reflect an attempt to alert that body to the claim to contested case proceedings now being argued.

■ We have no reason to disagree with the district court's thoughtful analysis concerning the nature of the proceedings before the EPC. It correctly concluded that mere referral by the EPC to the attorney general did not involve an adjudication of the facts in controversy, the hallmark of a contested case proceeding. *See Allegre v. Iowa State Bd. of Regents*, 349 N.W.2d 112, 114 (Iowa 1984). The complaint DeCoster now asserts was simply never raised before the commission and is, accordingly, waived. Our decision on this point applies with equal force to DeCoster's related claims concerning the commission's failure to file findings of fact or conclusions of law, and that its failure resulted in an unreasonable, arbitrary and capricious decision.

■ B. *Referral criteria.* The statutory scheme governing enforcement of environmental law violations authorizes the EPC to handle violations administratively (after contested case proceedings) or refer the matter to the attorney general for legal proceedings. *Compare* Iowa Code § 455B.175(1), *with* Iowa Code § 455B.175(4). Administrative regulations furnish express criteria to consider when imposing administrative penalties. *See* Iowa Admin. Code r. 567–10.2 (1992) (hereinafter "chapter 10"). DeCoster contends, however, that the evidence reveals the commission has no established criteria by which to gauge the need for referral to the attorney general. He challenges as unsupported by the record the district court's finding that the chapter 10 regulations are "ordinarily used as the measuring stick for referrals."

The record reveals testimony by EPC administrator, Allan Stokes, that his legal staff briefs the EPC on proposed referrals. That briefing includes discussion of the basic criteria underlying chapter 10—economic incentive to pollute, gravity of the violation, and culpability. Iowa Admin. Code r. 567–10.2(1)–(3); *see also* Iowa Code § 455B.109 (authorizing commission to establish schedule of penalties based on same relevant factors). The commission has before it the "litigation report" containing evidence supporting referral. Contrary to the claim made by

DeCoster, commission chairperson Rozanne King testified at trial that the chapter 10 criteria are used by the commission in its deliberations on referral matters. And, as the district court noted in its ruling, DeCoster's own attorney used the chapter 10 regulations in support of his argument against referral. In short, ample evidence supported the district court's finding on this point. No ground for reversal appears.

■ C. *Commission members as witnesses.* DeCoster's attack on the EPC's decision to refer the pollution incidents to the attorney general included its attempt to call as witnesses six of the nine EPC commissioners. The district court permitted limited examination of Rozanne King, chairperson, concerning the criteria used by the commission to make referral decisions. Over DeCoster's objection, the court prohibited counsel from inquiring into the reasoning behind the commission's vote, and also prevented DeCoster from calling the other commissioners as witnesses. On appeal, DeCoster asserts these limitations have deprived him of "access to the truth without the safeguard of judicial review."

We are convinced the court plainly acted within its broad discretion to limit the examination of the commissioners concerning their mental processes in reaching their referral decisions. The type of examination sought here by DeCoster was rejected over half a century ago by the United States Supreme Court in *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). There, in an action challenging an order issued by the United States Secretary of Agriculture, the Court likened the agency head to a judge and held he should never have been subjected to examination at trial concerning the process by which he reached the conclusions in his order. *Morgan,* 313 U.S. at 422, 61 S.Ct. at 1004–05, 85 L.Ed. at 1435–36. Following *Morgan,* state courts have consistently refused to permit agency decision makers to be examined

about their decision-making processes. *See, e.g., Board of Equalization v. Russell,* 941 P.2d 257, 264–65 (Colo. 1997) (improper to call member of county board of equalization as witness before state board of assessment appeals to explain how lower tribunal reached its decision); *Medical Licensing Bd. v. Provisor,* 669 N.E.2d 406, 408–09 (Ind. 1996) (physician disciplined by licensing board not entitled on judicial review to discovery by written interrogatories and request for admissions directed to the licensing board); *Pedernales Elec. Coop., Inc. v. Public Util. Comm'n,* 809 S.W.2d 332, 342 (Tex. Ct. App. 1991) (thought processes and motivations of agency members irrelevant to judicial review of agency order absent evidence of corruption).

■ When pertinent inquiry is allowed, it is "limited to information concerning the *procedural steps* that may be required *by law* and does not extend to inquiries into the mental processes of an administrator which, as being part of the judgmental process, are not discoverable." *People for Environmental Enlightenment & Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council,* 266 N.W.2d 858, 873 (Minn. 1978). The district court carefully applied these principles here. Although DeCoster continues to claim the governor's public statements call the commissioners' motives into question, the record is devoid of any proof—or even a hint—of political influence affecting the deliberations at issue here. No abuse of trial court discretion has been shown.

■ D. *Declaratory relief.* Prior to trial the district court dismissed DeCoster's counterclaim for a declaratory ruling that these pollution violations should not be considered "strikes" for purposes of establishing habitual violator status under Iowa Code section 455B.191(7)(a)-(e). DeCoster claims the court's dismissal was erroneous and compels reversal. The gist of DeCoster's claim is that the trial court, not the DNR, is in a better position to

impartially apply the habitual violator statute.

■ The district court correctly determined that the doctrine of primary jurisdiction bars DeCoster's claim for declaratory judgment. Under this rule of administrative law,

> courts will not determine a controversy involving a question which is within the jurisdiction of an administrative tribunal or agency prior to the solution of that question by the administrative tribunal (1) where the question demands the exercise of administrative discretion requiring the special knowledge, experience and services of the administrative tribunal, (2) to determine technical and intricate matters of fact, and (3) where a uniformity of ruling is essential to comply with the purposes of the regulatory statute administered.

*Northwestern Bell Tel. Co. v. Hawkeye State Tel. Co.*, 165 N.W.2d 771, 776 (Iowa 1969); *accord City of Waukee v. City Dev. Bd.*, 514 N.W.2d 83, 90 (Iowa 1994) (doctrine of primary jurisdiction compelled court to refrain from resolving annexation questions legislatively placed with development board).

Iowa Code section 455B.173(13) expressly vests the DNR with the duty to classify individuals as habitual violators based on statutorily prescribed criteria. Notice to the alleged violator is a prerequisite to imposition of enhanced penalties, *see* Iowa Code § 455B.191(7), and the alleged violations must relate to one of the statutory violations described in section 455B.191(7)(a)-(e). Until this litigation is concluded, those determinations—vested in the first instance in the DNR—cannot be made. It was wisely determined by the district court to be beyond its prerogative to do so. No error appears.

The State readily concedes that deferring to the DNR on this point does not leave DeCoster without a judicial remedy. If the DNR determines that DeCoster is an habitual violator, that agency action will be subject to judicial review in accordance with Iowa Code section 17A.19.

■ E. *Unconfirmed appointees.* DeCoster argued before the trial court, and now urges on appeal, that the newly appointed—but unconfirmed—members of the EPC were not authorized to participate and vote in the referral hearings. The district court rejected this argument and, we think, rightly so. To decide otherwise would potentially bring government to a standstill.

Iowa Code section 455A.6(1) provides that the EPC shall consist of nine members, appointed by the governor "subject to senate confirmation." By statute, vacancies are filled in the same manner as original appointments. Iowa Code § 455A.6(2). DeCoster correctly notes that section 455A.6 is silent with respect to the appointment procedure and whether interim appointees may serve pending senate confirmation. Those procedures and that authority, however, are furnished by Iowa Code section 2.32.

Iowa Code section 2.32(1)(b) expressly authorizes the governor to make appointments to positions which require senate confirmation in order to fill vacancies occurring prior to the convening of the general assembly. That is precisely what happened here. The governor appointed Rita Venner and Dean McWilliams in August 1996, several months before the legislature convened in January 1997.

As for the authority of these interim appointees to deliberate and vote with the commission, Iowa Code section 2.32(3) pertinently provides:

> *Sixty days after a person's appointment has been disapproved by the senate, that person shall not serve in that position as an interim appointment or by holding over in office and the governor shall submit another appointment or file a notice of deferred appointment before the sixty-day period expires.*

(Emphasis added.) Under this provision, even "disapproved" appointees may serve

up to sixty days. It necessarily follows that the legislature contemplated service by interim appointees prior to senate confirmation, as in the case before us.[2]

DeCoster argues strenuously that such a statutory scheme gives the governor "unfettered power to stack and/or control" an agency, without protection for Iowa's citizens from "abuse or potential abuse" pending senate confirmation. It appears Iowa's legislative leaders thought otherwise. The evident purpose of section 2.32 is to ensure that appointees are able to expeditiously assume office, and continue the agency's work, despite the fact that the legislature is not in session. This is the general rule applied in other jurisdictions. *See, e.g., Bank of Washington v. McAuliffe,* 676 S.W.2d 483, 486–87 (Mo.1984) (noting importance of governor's power to fill vacancies to protect government operations while preserving senate's duty to supervise appointments); 81A C.J.S. *States* § 84 (1977). DeCoster cites no authority to the contrary. We hold the interim appointees to the commission were authorized to take action on the violations at issue. The district court was correct in so ruling.

■ F. *Compliance with agency rules of order.* In the district court, and now on appeal, DeCoster makes much of the fact that the EPC vote to reconsider the violation at Nursery Unit # 3 was initiated upon the motion of a member *not* on the prevailing side during its earlier vote. The earlier vote on referral had resulted in a tie, thus defeating the motion. The commission's subsequent action on the referral vote was contrary to the rules of parliamentary procedure it had previously adopted.

DeCoster claims the commission's procedural error dooms the referral, and the court erred in not ordering dismissal of the State's case. The State concedes error but, like the district court, emphasizes the harmlessness of the parliamentary mis-

step. The renewed vote was unanimous in favor of referral to the attorney general.

In nearly identical circumstances involving a parliamentary challenge to a city council's action, this court stated:

> Because parliamentary rules are adopted by a council to govern its internal procedures, the procedures may be waived by the council: "The important inquiry always is whether the number required by law have agreed to a particular measure. If this has been done in a way not inconsistent with statutory provisions, it is quite immaterial whether parliamentary procedure has been followed."

*Smith v. City of Dubuque,* 376 N.W.2d 602, 605 (Iowa 1985) (quoting *Mann v. City of LeMars,* 109 Iowa 251, 254, 80 N.W. 327, 328 (1899)). The same reasoning applies here. DeCoster acquired no vested right in the EPC's failure to go forward with referral during its earlier deliberations. *See id.* The district court committed no error in rejecting DeCoster's contention.

■ G. *Strict liability.* For its final assignment of error, DeCoster contends the district court erred when it ruled as a matter of law that Iowa Code section 455B.191 imposes a strict liability standard upon livestock producers who discharge waste into the state's watercourses. DeCoster claims the language of the statute calls for no more than a negligence standard. Such negligence is established, DeCoster concedes, with respect to the knowing over-spray of liquid manure on frozen ground near Sow Unit # 1. But he claims the undiscovered deep drainage discharge from the broken tile at Nursery Unit # 3 cannot be attributed to "active human conduct" on the part of DeCoster employees.

Iowa Code section 455B.191(1) states:

Any person who violates any provision of part 1 of division III of this chapter or any permit, rule, standard, or order issued under part 1 of division III of this

2. The record reveals these appointees were confirmed by the senate in March 1997.

chapter shall be subject to a civil penalty not to exceed five thousand dollars for each day of such violation.

We recently held section 455B.191(1) is not grounded on fault but calls for strict liability. *State ex rel. Miller v. DeCoster,* 596 N.W.2d 898, 902 (Iowa 1999). This civil penalty provision stands in marked contrast to subparagraph (2) of the same section which authorizes criminal prosecution and penalties only for those persons who "negligently or knowingly" pollute in violation of the law. Iowa Code § 455B.191(2). Thus we held in *DeCoster* that, read plainly, "the statute is violated when, as here, the operator places the pollutant so that its introduction into the state's water results." *DeCoster,* 596 N.W.2d at 902. We rejected DeCoster's contention that only "direct introduction" of pollution qualified for strict accountability. *Id.* To do otherwise, we reasoned, would contravene the general rule that environmental statutes must be given a liberal, rather than narrow, interpretation in order to advance their ' public safety purposes. *Id.*

■■■■■ The record contains substantial evidence to support the trial court's finding that DeCoster constructed a hog waste lagoon over a tile line at Nursery Unit # 3, and a break in that tile permitted leakage of highly toxic waste into a drainage ditch that flows to the Iowa River. As noted by the district court, the State need not prove the pollutant made its way to the river because "water of this state" by definition includes such tiles and ditches. Iowa Code § 455B.171(32); *see also id.* § 455B.201 (prohibiting confinement feeding operation from discharging manure into tile lines that discharge directly into waters of the state).

In short, the court made no mistake when it held DeCoster strictly liable for the discharge at Nursery Unit # 3, as well as the discharge at Sow Unit # 1. We therefore affirm in all respects the district court's judgment in favor of the State.

**AFFIRMED.**