# IN THE SUPREME COURT OF IOWA

No. 11–1452

Filed December 14, 2012

**OFFICE OF CITIZENS' AIDE/OMBUDSMAN,**

Appellee,

vs.

**DEB EDWARDS** and **IOWA DEPARTMENT OF CORRECTIONS,**

Appellants.

Appeal from the Iowa District Court for Polk County, Joel D. Novak, Judge.

An administrative law judge and the department of corrections appeal the district court's order overruling her mental-process privilege and compelling her deposition in the Ombudsman's investigation of her decision in a prison disciplinary matter. **AFFIRMED.**

Thomas J. Miller, Attorney General, and William A. Hill, Assistant Attorney General, for appellants.

Charles Andrew Teas, Des Moines, for appellee.

**WATERMAN, Justice.**

The fighting issue in this appeal is whether an administrative law judge (ALJ) may assert the mental-process privilege to limit her deposition testimony in an investigation by the Office of Citizens' Aide/Ombudsman (Ombudsman) into her ruling on a prison disciplinary matter. Deb Edwards, an independent ALJ within the Iowa Department of Corrections (IDOC), presided over the hearing of an inmate charged with assaulting a corrections officer. Edwards found the inmate guilty of assault, class "B," and imposed a 180-day, loss-of-earned-time penalty that doubled the maximum ninety-day penalty prescribed under corrections policy but matched the 180-day penalty requested in a prehearing, ex parte email to her from the warden. The Ombudsman, pursuant to its agency watchdog role under Iowa Code chapter 2C (2009), launched an investigation. Edwards later amended her decision to escalate her classification of this assault from "B" to "A," without identifying any aggravating factors, as required under corrections policy.

The Ombudsman subpoenaed Edwards for deposition testimony after receiving inconsistent explanations from her and the warden during informal interviews and after discovering the warden's prehearing email. The parties disagreed over whether Edwards could validly assert the mental-process privilege to refuse to answer questions about her decision. *See* § 2C.21 (persons required to provide information to the Ombudsman "shall be accorded the same privileges and immunities as are extended to witnesses in [Iowa] courts"); *State ex rel. Miller v. DeCoster*, 608 N.W.2d 785, 790 (Iowa 2000) (recognizing mental-process privilege). The parties also disagreed whether the privilege was overcome by a showing of improper external pressure on Edwards based on the warden's email purportedly dictating the penalty the independent ALJ was to impose. *See Martin Marietta Materials, Inc. v. Dallas County,* 675 N.W.2d 544, 554–55 (Iowa 2004) (allowing mental-process privilege to be

overcome upon a strong showing of bad faith or improper behavior). The Ombudsman filed an action in district court to enforce the subpoena, and the parties filed cross-motions for summary judgment on the applicability of the mental-process privilege and the showing required to defeat it.

The district court ruled the mental-process privilege would not apply to limit deposition testimony in the Ombudsman's investigation, as opposed to a judicial proceeding. Accordingly, the district court did not reach the question whether the Ombudsman had made a sufficient showing of bad faith or impropriety to overcome the privilege. Edwards and IDOC appealed, and we retained the appeal to decide questions of first impression on the applicability of the mental-process privilege under these circumstances.

On our review, we hold the mental-process privilege is available to IDOC ALJs in an Ombudsman investigation, but conclude, based on this record, the Ombudsman has made a sufficient showing to overcome the privilege. For the reasons explained below, we affirm the order overruling Edwards's mental-process privilege in this case and compelling her deposition.

## I. Background Facts and Proceedings.

On April 2, 2008, Randy Linderman, an inmate at the Fort Dodge Correctional Facility (FDCF), was involved in an altercation with a corrections officer in a common area within view of other inmates. Linderman was "verbally disruptive and physically inappropriate with [the corrections officer] to the point that the offender assaulted the officer with his body several times." Specifically, Linderman chest bumped the corrections officer two or three times and disobeyed commands until other guards arrived to take control. The altercation was recorded by a surveillance camera.

Linderman was charged with violating prison rules prohibiting assaults, threats, and verbal abuse. An evidentiary hearing was completed on April 24. Edwards, an ALJ for the IDOC with twelve years' experience in that capacity,

presided over the hearing. She watched the video of the incident, reviewed witness statements, and reviewed a written submission by Linderman. In her hearing decision dated April 24, Edwards noted Linderman "pled guilty . . . admitting that he was angry at the time of the violation." Edwards found that:

> The offender's behavior placed a staff member['s] safety at risk, disrupted the normal operation of Boone and failed to follow any directives given him by that staff member until other staff arrived on the scene and moved him to A building.

Edwards found Linderman guilty of class "B" assault and entered a sanction of 180 days of disciplinary detention and 180 days loss of earned time. Her decision concluded:

> This sanction reflects the severity of the offense and is appropriate to the nature of the offense. . . . This ALJ is also recommending that the classification committee review the offender for a possible transfer to a more secure environment.

Linderman appealed the decision to Cornell Smith, warden at FDCF, who affirmed the decision on April 28. Linderman did not seek postconviction judicial review, but complained to the Ombudsman. The Ombudsman launched an investigation into whether the IDOC and Edwards followed Iowa law and corrections policy in this matter. The investigation initially focused on whether the loss-of-earned-time sanction Linderman received was excessive. Under then-existing policy, a class "B" assault could result in loss of earned time of up to ninety days. IDOC Policy IO-RD-01(IV)(P)(2)(a)(2)(a) (Jan. 2007); *see also* Iowa Code § 903A.4 (authorizing the IDOC to develop disciplinary policies and rules for prisons including "the amount of earned time which may be lost as a result of each disciplinary offense"). Thus, it appeared that the sanction of 180 days of loss of earned time for Linderman's class "B" assault was facially excessive. The ALJ is permitted under IDOC policy to aggravate an offense to the next level, but is to "specify in writing the aggravating circumstances warranting a change in sanction." IDOC Policy IO-RD-01(III)(B).

A nonexclusive list of six aggravating factors is included in the policy: (1) history of violence, (2) use of weapon, (3) severity of injury, (4) significant impact to institutional operations, (5) repeat infractions, and (6) premeditation. *Id.* None of these factors is expressly identified in Edwards's April 24 decision.

An assistant Ombudsman, Bert Dalmer, conducted unsworn, unrecorded interviews of Edwards by phone on May 12 and June 3. Dalmer, relying on his contemporaneous notes, stated, "Deb very distinctly told me twice in my first contact with her on this case that she believed she could have aggravated this case but decided not to." Dalmer then spoke with Warden Smith, who told Dalmer that "the ALJ told [Smith] she intended to aggravate." On June 12, Dalmer contacted Michael Savala, general counsel for the IDOC and supervisor for IDOC ALJs. The same day, Edwards spoke with Savala and modified her ruling to change the classification of Linderman's assault offense from class "B" to class "A," again without specifically identifying any of the aggravating circumstances enumerated under prison policy and without using any variation of the term "aggravated." Edwards merely added the following to the disposition section:

> The ALJ is modifying an error that occurred when submitting this report hearing, the class offense of the assault is an (A) violation and is being modified to reflect the seriousness of the violation at this time. A copy is being forwarded to the offender at ASP and to the Warden here at FDCF. The offender's behavior was consistent with the DOC policy IO RD-01 (II)(a)(P)(b).

Savala told Dalmer he was unable to find the policy provision Edwards cited in her June 12 decision.

Dalmer noted his office had examined other disciplinary sanctions and "found assaults [they] would deem to be more serious involving feces, urine, spit, punches that led to the same sentence or lesser sentences than this particular case." He also noted four other decisions, including one by

Edwards, which used a form of the word "aggravated" when imposing more severe sanctions.

As the investigation continued, the Ombudsman learned Warden Smith had sent Edwards an email after Linderman's altercation with the corrections officer, but before the disciplinary hearing, stating, "Please exercise sanctions to fit situation (180 to 365)."[1] The Ombudsman viewed the warden's email as improper external pressure on the ALJ whose independence is required by law. The Ombudsman argues the warden effectively dictated the penalty Edwards was to impose before she commenced the hearing.

The Ombudsman deposed Warden Smith and Savala. The Ombudsman invited Edwards to voluntarily provide her sworn testimony, but she declined. Accordingly, the Ombudsman subpoenaed Edwards for deposition. IDOC counsel responded by letter, asserting that the Ombudsman could not question Edwards about her "motive, influences and decision making process in a specific disciplinary case." The parties postponed the deposition while they negotiated the scope of the testimony. Ultimately, they were unable to agree, and the Ombudsman issued a second subpoena for Edwards's sworn testimony on May 17, 2010. The parties stipulated the Ombudsman could question Edwards regarding the background and some of the procedural issues pertaining to the Linderman disciplinary proceeding, but acknowledged IDOC counsel would object and instruct Edwards not to answer questions regarding her decision-making process.

---

[1]Although the email does not appear in the record, the relevant quote was included in the Ombudsman's "Statement of Undisputed Material Facts in Support of [Its] Motion for Summary Judgment." The quotation from the email was admitted in the response filed by IDOC and Edwards. No party contends anything else in that email is relevant to the issues on appeal. The video of the incident referenced in Edwards's hearing decision is not in the court record; however, neither party claims that review of the video would help determine whether a showing has been made to overcome the mental-process privilege.

The Ombudsman filed a petition in the District Court for Polk County seeking judicial enforcement of the subpoena issued to Edwards pursuant to Iowa Code section 2C.9(5). Both parties moved for summary judgment on the applicability of the mental-process privilege. The Ombudsman argued that the privilege was only available in judicial proceedings, not in an investigatory deposition of an IDOC ALJ under chapter 2C. Alternatively, the Ombudsman argued it had made a sufficient showing to defeat the privilege. Edwards and IDOC argued the mental-process privilege applied and no showing had been made to defeat it. They also contended Linderman's failure to exhaust his remedies by seeking postconviction relief precluded further investigation by the Ombudsman.

The district court granted the Ombudsman's motion for summary judgment. The court did not decide whether the Ombudsman had made a showing sufficient to defeat the mental-process privilege if it applied. Instead, the court noted the Ombudsman "makes a compelling argument that the 'mental process rule' applies only to judicial proceedings, and not investigations." The court ruled that "ALJ Deborah Edwards's testimony is not privileged and the [Ombudsman] may take her sworn testimony." The court itself acknowledged concern over the precedent set by requiring an ALJ to submit to a deposition explaining her thought processes behind an adjudicatory ruling:

> The court is not unmindful of the consequences of precedent that could be set. Nevertheless, the negative ramifications of this precedent may be mitigated by the narrow facts of this case, and that the [Ombudsman] would not likely subpoena ALJs as frequently as the Department of Corrections predicts.

The court ordered Edwards and IDOC to comply with the deposition subpoena, with no limitations on her testimony. This appeal followed.

## II. Standard of Review.

We review rulings on summary judgment for corrections of errors of law. *Emp'rs Mut. Cas. Co. v. Van Haaften,* 815 N.W.2d 17, 22 (Iowa 2012). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* This court reviews questions of statutory interpretation for corrections of errors at law. *State v. Overbay,* 810 N.W.2d 871, 875 (Iowa 2012).

We review district court orders regarding the discovery process, including those enforcing an ombudsman subpoena, for abuse of discretion. *Citizens' Aide/Ombudsman v. Grossheim,* 498 N.W.2d 405, 407 (Iowa 1993). "Abuse of discretion may be shown where there is no record to support the court's factual conclusions, or where the decision is grounded on reasons that are clearly untenable or unreasonable." *Id.* " 'A ground or reason is untenable . . . when it is based on an erroneous application of the law.' " *In re Gianforte,* 773 N.W.2d 540, 544 (Iowa 2009) (quoting *Graber v. City of Ankeny,* 616 N.W.2d 633, 638 (Iowa 2000)).

## III. The Statutory Framework.

We have not previously addressed the applicability of the mental-process privilege in an investigation by the Ombudsman into the decision of an IDOC ALJ. To put the issue in proper context, we will first review the role and powers of the Ombudsman and then explore the duties of the independent ALJs in the IDOC. The question of whether Edwards may assert the privilege against the Ombudsman must be answered against this backdrop. We begin our analysis by reiterating "that courts are obliged to grant prison officials a wide berth in the execution of policies and practices needed to maintain prison discipline and security." *Grossheim,* 498 N.W.2d at 407. We also reiterate that inmates are constitutionally entitled by due process to an impartial ALJ in prison disciplinary proceedings. *Thompson v. State,* 533 N.W.2d 215, 216–17

(Iowa 1995). *See generally Botsko v. Davenport Civil Rights Comm'n*, 774 N.W.2d 841, 848–52 (Iowa 2009) (reviewing due process required in administrative proceedings).

### A. The Ombudsman's Role as "Watchdog."

1. *Purpose of the Ombudsman's office.* In 1972, the general assembly established the Ombudsman's office, which serves "as a 'watch dog' for state administrative agencies." *Citizens' Aide/Ombudsman v. Miller*, 543 N.W.2d 899, 902–03 (Iowa 1996). The Ombudsman's "purpose is to investigate complaints received 'from any source concerning an administrative action' of a state agency." *Id.* at 902 (quoting Iowa Code § 2C.12). States created these offices to safeguard the rights of individuals subject to administrative decision making, at a time when administrative agencies were gaining an increasing presence, power, and discretion in state government. Bernard Frank, *State Ombudsman Legislation in the United States*, 29 U. Miami L. Rev. 397, 397–99 (1975) [hereinafter Frank]; *see also* Thomas A. Mayes, *Protecting the Administrative Judiciary from External Pressures: A Call for Vigilance*, 60 Drake L. Rev. 827, 828 (2012) [hereinafter Mayes] ("[T]he administrative law judiciary is so integral to the function of the modern state that it is commonly, if not accurately, referred to as a 'fourth branch of government.' "). Frank noted in particular that

> [t]he traditional concern for the guaranty of the rights of the individual has become even greater in modern society. The activities of public administration have become so comprehensive and the power of the bureaucracy so great that the status of the individual needs additional protection.

Frank, 29 U. Miami L. Rev. at 398. Iowa was one of the first states to enact legislation creating the office of the ombudsman. *Id.* at 397.

A major issue with the preombudsman administrative system was that, even if an agency had a channel for complaint, that channel may "lack

independence and impartiality." *Id.* at 398. In addition to safeguarding the rights of individuals, the Ombudsman also alleviates some of the burdens placed on courts, especially in the context of the administrative actions involving prisoners. *Shabazz v. Scurr*, 662 F. Supp. 90, 92 (S.D. Iowa 1987) ("Courts have a special interest in protecting the [Ombudsman's] problem-solving function. This Court spends far too many hours in litigation between prisoners and state officials attempting to remedy problems which could have been prevented or reconciled informally.").

> In its role as a "watchdog," the Iowa Ombudsman has
>
> the responsibility to investigate complaints from any persons regarding administrative actions of Iowa state or local government agencies and to render objective opinions or recommendations on the complaints, in the interests of resolving complaints and improving administrative processes and procedures.

Iowa Admin. Code r. 141—1.1 (2008). If at the conclusion of its investigation the complaint is substantiated, the Ombudsman may make recommendations to the administrative agency and, if its recommendation involves changing the governing statutory law, to the general assembly. *See Shabazz*, 662 F. Supp. at 91 (citing Iowa Code §§ 601G.9, .16, now codified as §§ 2C.9, .16); *see also* Iowa Admin. Code r. 141—2.11(3), (5).

2. *The Ombudsman's subpoena power.* The Ombudsman has statutory authority to investigate agency action, with certain exceptions. Iowa Code § 2C.9(1). This includes the power to "[i]ssue a subpoena to compel any person to appear, give sworn testimony, or produce documentary or other evidence relevant to a matter under inquiry." *Id.* § 2C.9(5). The judicial branch is beyond the reach of the Ombudsman's investigatory power. *See id.* § 2C.1(2)(*a*) (excluding from the definition of agency "[a]ny court or judge or appurtenant judicial staff"). Edwards, however, is employed by IDOC, a state agency, not the judicial branch. As an agency employee, she falls outside the exclusion for

"judges" in section 2C.1(2)(*a*).[2] But, the question remains whether, as an IDOC ALJ, Edwards may assert a common law mental-process privilege or immunity against compelled testimony. *See* § 2C.21 (allowing persons required to provide information to the Ombudsman to assert "the same privileges and immunities as are extended to witnesses in . . . [Iowa] courts").

---

[2]Under a plain language reading of section 2C.l(2)(*a*), the term "judge" next to "court" refers to judges in the judicial branch, not ALJs operating in state agencies. This interpretation is supported by the drafter's comments to model ombudsman acts with the same language excluding courts and judges from the ombudsman's purview. "In the absence of instructive Iowa legislative history, we also look to the comments and statements of purpose contained in Uniform Acts to guide our interpretation of a comparable provision in an Iowa Act." *Alcor Life Extension Found. v. Richardson*, 785 N.W.2d 717, 722 (Iowa Ct. App. 2010); *see also Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 115 (Iowa 2011) ("Our court has relied on the drafter's comments to the Uniform [Comparative Fault] Act in construing the Iowa act.").

At the time the general assembly passed the Iowa Citizens' Aide legislation, there were two predominate model ombudsman acts. *See* Frank, 29 U. Miami L. Rev. at 399. Iowa's act, when passed, contained language similar to that found in Professor Walter Gellhorn's Annotated Model Ombudsman Statute. *See id.* at 399 n.6; *see also* Walter Gellhorn, *Appendix: Annotated Model Ombudsman Statute*, in *Ombudsmen for American Government?*, 159–71 (American Assembly, ed. 1968) [hereinafter Gellhorn] (reproducing Professor Gellhorn's Annotated Model Ombudsman Statute). Gellhorn's model act later served as the basis for the American Bar Association's Model Ombudsman Statute for State Governments, which was published in 1974, two years after the enactment of Iowa Code chapter 2C. Frank, 29 U. Miami L. Rev. at 401. The ABA's model act and comments reflect a contemporaneous understanding that the exclusion for courts and judges is limited to the judicial branch.

The 1974 version of the ABA's model ombudsman statute contains an identical exclusion to Iowa's for "any court, or judge and appurtenant judicial staff." *Compare id.* at 404, *with* Iowa Code § 2C.1(2)(*a*). The comment accompanying the ABA exclusion states:

> An exclusion of the *judicial branch* rests on its traditional independence and immunity from investigation; its internal review mechanisms (e.g., judicial conference); its continuous review by the profession (viz., Bar); and, in some states, its review by judicial commissions.

Frank, 29 U. Miami L. Rev. at 405 (emphasis added). This comment is consistent with a similar discussion found in the comments to Professor Gellhorn's model statute. *See* Gellhorn, at 160 ("Traditional immunization of courts against extra-judicial scrutiny argues against permitting an American ombudsman to inquire into a judge's behavior.").

The Iowa Judicial Branch consists of the supreme court, the court of appeals, the district court, the clerks of all of the courts of this state, juvenile court officers, court reporters, and all other court employees. *See* Iowa Code § 602.1102. The Iowa Judicial Branch does not include ALJs employed by the IDOC.

Generally, a court is to enforce an Ombudsman subpoena, "so long as the four-factor test we adopted in *Roadway* is met." *Grossheim*, 498 N.W.2d at 407. The four-factor test requires that the subpoena be " '(1) within the statutory authority of the agency, (2) reasonably specific, (3) not unduly burdensome, and (4) reasonably relevant to the matters under investigation.' " *Id.* at 406 (quoting *Iowa City Human Rights Comm'n v. Roadway Express, Inc.*, 397 N.W.2d 508, 510 (Iowa 1986)). The first prong is at issue here. Specifically, we must decide whether the Ombudsman has the authority to depose an IDOC ALJ regarding her decision adjudicating an inmate's violation of prison rules and imposing penalties. This requires an analysis of the role of IDOC ALJs in prison disciplinary proceedings.

**B. The Role of IDOC ALJs in Prisoner Disciplinary Proceedings.** Our review of the governing statutes confirms IDOC ALJs are to be independent and impartial adjudicators performing a quasi-judicial role in prison disciplinary cases.

1. *IDOC ALJs are to be impartial, independent adjudicators.*[3] "[A]n impartial tribunal is a fundamental right imposed by due process in [prison] disciplinary proceedings." *Thompson*, 533 N.W.2d at 216. The director of the IDOC is statutorily required to appoint "independent" ALJs to preside over prisoner disciplinary hearings. Iowa Code § 903A.1 ("The director of the Iowa

---

[3]Although impartiality and independence are sometimes used interchangeably, they are distinct concepts. *See* Mayes, 60 Drake L. Rev. at 827 n.1. "[I]mpartiality . . . refers to 'fair-minded, neutral decisionmaking,' " whereas, independence, "a 'subset of impartiality,' is ' "autonomy and insusceptibility to external guidance, influence, or control." ' " *Id.* (quoting James E. Moliterno, *The Administrative Judiciary's Independence Myth*, 41 Wake Forest L. Rev. 1191, 1200, 1202–03 (2006)). Mayes goes on later to discuss the interconnected relationship between independence and impartiality, calling independence a "means of protecting impartiality." *Id.* at 835, 836 ("If independence is a protector of impartiality and some degree of impartiality is a required attribute of the administrative judiciary, I suggest that some amount of lawmaking independence and autonomy, albeit to a lesser degree, is necessary for the administrative judiciary." (Footnotes omitted.)).

department of corrections shall appoint *independent* administrative law judges whose duties shall include but are not limited to review, as provided in section 903A.3, of the conduct of inmates in institutions under the department." (Emphasis added.)); *id.* § 903A.3(1) ("[T]he *independent* administrative law judge may order forfeiture of any or all earned time . . . ." (Emphasis added)). IDOC's administrative regulations require ALJs to be impartial and to make their decisions "*solely* on information obtained in the hearing process." Iowa Admin. Code r. 201—50.21(4)(*b*)(13) (emphasis added); *id.* r. 201—50.21(4)(*b*)(10);[4] IDOC Policy IO-RD-01(IV)(D)(11); *see also Thompson,* 533 N.W.2d at 216–18 (discussing impartiality required of IDOC ALJs).

Significantly, to preserve their independence, IDOC ALJs report to and are supervised by the general counsel for the IDOC rather than the warden. *See* Iowa Admin. Code r. 201—1.8(6)(*e*). Savala testified as follows:

> [T]he Iowa Code requires that we have independent administrative law judges at the facilities and they report to me in Des Moines as general counsel to maintain that independence. That's why I'm their supervisor.
>
> So they are not aligned with anybody at the facility whether that's -- they're not aligned with security, they're not reporting to the warden or anyone else. They report to me to maintain that judicial independence.

Thus, IDOC's general counsel, not the warden, hires and fires the ALJs, approves their vacation and sick leave, and conducts evaluations of their performance.

---

[4]We note that ALJs employed by the IDOC are not subject to certain laws governing ALJs in other state agencies deciding contested cases under Iowa Code chapter 17A. *See* Iowa Code § 903A.1 ("Sections 10A.801 and 17A.11 do not apply to administrative law judges appointed pursuant to this section."). In particular, the Code of Administrative Judicial Conduct, which by its express language applies to presiding officers in contested cases under section 17A.11, does not govern the conduct of ALJs for the IDOC. *See* Iowa Admin. Code r. 481—10.29.

2. *IDOC ALJs act as quasi-judicial officers in prison disciplinary proceedings.* The quasi-judicial role played by IDOC ALJs is confirmed by a review of the prison disciplinary process.

The prison disciplinary process begins upon discovery of an inmate rule violation. Prison staff members are required to prepare a disciplinary report with the following information:

    1. Specific rule(s) violated;

    2. A statement of the charge;

    3. Any unusual prisoner behavior;

    4. Any staff witnesses;

    5. An explanation of the event that includes who was involved, what transpired, and the time and location of the occurrence;

    6. Any physical evidence and its disposition; [and]

    7. Any immediate action taken, including the use of force.

*See id.* r. 201—50.21(4)(*b*)(3). An impartial investigation of the violation must begin within twenty-four hours of when the violation was first reported. *See id.* r. 201—50.21(4)(*b*)(4).

The disciplinary hearing must "be conducted no later than seven days, excluding weekends and holidays, following the report of the alleged rule violation." *Id.* r. 201—50.21(4)(*b*)(8). The prisoner must "receive a written statement of the charge(s), including a description of the incident and the specific rule(s) violated . . . at least 24 hours prior to the disciplinary hearing." *Id.* r. 201—50.21(4)(*b*)(6). The prisoner is entitled to be "present at the hearing, unless the prisoner waives that right in writing or is a threat to the security and safety of the facility." *Id.* r. 201—50.21(4)(*b*)(7). The prisoner is also entitled "to make a statement and present documentary evidence at the hearing and to call witnesses on their behalf unless calling witnesses creates a threat to security or safety of the facility." *Id.* r. 201—50.21(4)(*b*)(11).

When presiding over a prison disciplinary hearing, the ALJ considers the evidence presented and writes a report with her decision and the "supporting reasons." *See id.* r. 201—50.21(4)(*b*)(14). Linderman was charged with assault. Under IDOC policies,

> an offender commits assault when the offender intentionally causes or threatens to cause injury to another person or applies any physical force or offensive substance (i.e. feces, urine, saliva, mucous) or any other item against any person regardless of whether injury occurs.

IDOC Policy IO-RD-01(IV)(P)(4)(2). The policy differentiates between two classes of assaults. An assault is class "A" "if [a] weapon or potentially infectious bodily fluids, secretions, tissue, or excrement [has] been used." *Id.* All other assaults are class "B." *Id.* However, under IDOC policies, "[i]f the Administrative Law Judge determines that the factors or circumstances of an offense are more serious than the charged offense, the sanction may be upgraded to the next class." *Id.* IO-RD-01(III)(B). If the ALJ makes such a determination, then she must "specify in writing the aggravating circumstances warranting a change in sanction." *Id.* IDOC policy states that "[a]ggravating factors may include, but are not limited to, history of violence, use of weapon, severity of injury, significant impact to institutional operations, repeat infractions, and premeditation." *Id.*

A copy of the report prepared by the ALJ must then be given to the prisoner. *See* Iowa Admin. Code r. 201—50.21(4)(*b*)(14). The prisoner has twenty-four hours to "appeal the decision to the jail administrator or designee." *Id.* r. 201—50.21(4)(*c*); *see also* Iowa Code § 903A.3(2). However, even if the prisoner does not appeal the decision, IDOC regulations provide for automatic appeal, whereby "the jail administrator or designee [is required] to review all disciplinary hearings and dispositions to ensure conformity with the jail policy and procedures." Iowa Admin. Code r. 201—50.21(4)(*b*)(15). The jail

administrator at FDCF is the warden. On appeal, the warden "may either affirm, modify, remand for corrections of procedural errors, or reverse an order." Iowa Code § 903A.3(2). However, the warden may not increase sanctions issued by the ALJ. *Id.* After exhausting the administrative remedies provided in Iowa Code section 903A.3, a prisoner who claims that the "reduction of sentence pursuant to sections 903A.1 through 903A.7 has been unlawfully forfeited" may seek postconviction review under chapter 822. *Id.* § 822.2(1)(*f*).[5]

With this statutory backdrop in mind, we now turn to analyze whether an IDOC ALJ such as Edwards can assert the mental-process privilege during an Ombudsman's investigation.

### IV. The Mental-Process Privilege.

We begin with an overview of the mental-process privilege. "It has long been recognized that attempts to probe the thought and decision making

---

[5]Edwards and IDOC argued allowing the Ombudsman's investigation to go forward would undermine the principles of the exhaustion doctrine, which requires a party challenging an administrative action to exhaust all of its administrative remedies before pursuing review of that action in court. *See Aschan v. State*, 446 N.W.2d 791, 792–94 (Iowa 1989) (holding that prisoners must exhaust all administrative remedies before seeking postconviction review). Whether Linderman exhausted all administrative and judicial remedies is irrelevant to determining whether the *Ombudsman* has authority to investigate the administrative action. As IDOC and Edwards acknowledge, the Iowa Code permits the Ombudsman to undertake such investigations "without regard to the finality of the administrative action." Iowa Code § 2C.9(1). This authorizes the Ombudsman to pursue an investigation separate and independent from any administrative or judicial remedy available to the complainant, consistent with the Ombudsman's role:

> The Ombudsman provides the citizen with an expert and impartial agent who acts informally, without time delay, without cost to the complainant, and without the requirement of counsel or an adversary proceeding, to determine whether the complainant has been wronged by government, and, if so, to recommend corrective action. *He supplements and does not replace existing institutions.*

Frank, 29 U. Miami L. Rev. at 399 (emphasis added). Thus, under this provision, the Ombudsman's power to commence an investigation of agency action is not dependent upon whether the complainant seeks administrative and judicial review of the agency action.

processes of judges and administrators are generally improper." *Grant v. Shalala*, 989 F.2d 1332, 1344 (3d Cir. 1993) (citing *United States v. Morgan*, 313 U.S. 409, 422, 61 S. Ct. 999, 1004–05, 85 L. Ed. 1429, 1435–36 (1941)). The *Grant* court observed " 'the process of agency adjudication is currently structured so as to assure that the [ALJ] exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency' . . . [in a role] ' "functionally comparable" ' to that of a judge." *Id.* (citations omitted) (quoting *Butz v. Economou*, 438 U.S. 478, 513, 98 S. Ct. 2894, 2914, 57 L. Ed. 2d 895, 920 (1978)). We note the same is true of the role of IDOC ALJs in prison disciplinary cases. In *Grant*, Judge Alito cautioned that allowing discovery into the ALJ's thought processes "would have a deleterious effect on the independence of ALJs." *Id.* We share these concerns here.

"The mental process privilege is a corollary to the deliberative process privilege that protects uncommunicated motivations for a policy or decision." *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1024 (E.D. Cal. 2010) (internal quotation marks omitted). Both are qualified privileges "that may be overcome by a litigant." *Id.* at 1025; *Martin Marietta*, 675 N.W.2d at 554–55 (recognizing mental-process privilege may be overcome by strong showing of bad faith or misconduct). By contrast, the judicial deliberative privilege is absolute. *In re Enforcement of a Subpoena*, 972 N.E.2d 1022, 1033 (Mass. 2012) ("This absolute privilege covers a judge's mental impressions and thought processes in reaching a judicial decision, whether harbored internally or memorialized in other nonpublic materials.").

The leading case for the mental-process privilege is *Morgan.* In that case, the Secretary of Agriculture entered an order following a quasi-judicial proceeding to set maximum rates charged by market agencies at the Kansas City stockyards. *Morgan,* 313 U.S. at 413, 61 S. Ct. at 1000, 85 L. Ed. at

1430–31. In an action challenging the order in federal court, the Secretary, over the government's objection, was called as a witness. *Id.* at 421–22, 61 S. Ct. at 1004, 85 L. Ed. at 1435. "He was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record . . . ." *Id.* at 422, 61 S. Ct. at 1004, 85 L. Ed. at 1435. The U.S. Supreme Court held the Secretary "should never have been subjected to this examination" and admonished that " 'it was not the function of the court to probe the mental processes of the Secretary.' " *Id.* (quoting *Morgan v. United States*, 304 U.S. 1, 18, 58 S. Ct. 773, 776, 82 L. Ed. 1129, 1132 (1938)). The *Morgan* Court stated, "Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." *Id.* at 422, 61 S. Ct. at 1004–05, 85 L. Ed. at 1435 (citation omitted).

We applied the mental-process privilege in *DeCoster*. DeCoster, a large-scale hog producer responsible for manure spills, challenged the Environmental Protection Commission's (EPC) decision to refer violations of the state pollution laws to the attorney general for prosecution. *DeCoster*, 608 N.W.2d at 787. DeCoster sought to call six of the nine EPC commissioners as witnesses. *Id.* at 790. The district court allowed limited examination of the EPC chair regarding the referral criteria, but "prohibited counsel from inquiring into the reasoning behind the commission's vote, and also prevented DeCoster from calling the other commissioners as witnesses." *Id.* We concluded the district court "plainly acted within its broad discretion to limit the examination of the commissioners concerning their mental processes in reaching their referral decisions." *Id.* We noted that "type of examination . . . was rejected over half a century ago by the United States Supreme Court in [*Morgan*]." *Id.*

Thus, persons acting in a quasi-judicial capacity generally are immune from compulsory discovery into the mental processes behind their decision

making. *See id.*; *In re Gianforte*, 773 N.W.2d at 549 (holding school board members who terminated teacher could not be compelled to answer interrogatories); *Martin Marietta*, 675 N.W.2d at 553–54 (members of board of adjustment generally cannot be deposed as to "the mental processes of . . . how they reached their decision" without a strong showing of bad faith or misconduct sufficient to defeat the privilege). Accordingly, we look to whether Edwards functioned in a quasi-judicial capacity in Linderman's case to determine whether she may assert the mental-process privilege.

> One test articulated by our court to determine whether a tribunal [or individual] is exercising a quasi-judicial function is whether "the questioned act involves a proceeding in which notice and opportunity to be heard are required;" or whether a "determination of rights of parties is made which requires the exercise of discretion in finding facts and applying the law thereto."

*Waddell v. Brooke*, 684 N.W.2d 185, 191 (Iowa 2004) (quoting *Buechele v. Ray*, 219 N.W.2d 679, 681 (Iowa 1974)) (describing a test used in determining whether writ of certiorari should be granted). We are convinced that Edwards indeed served in a quasi-judicial role in Linderman's disciplinary hearing. As described above, she presided over his hearing, made findings as to his violation of prison rules, and imposed penalties. Additionally, Linderman was required to be given notice and an opportunity to be heard.

We next decide whether Edwards may invoke the mental-process privilege to limit questioning by the Ombudsman in an investigatory deposition.

**A. Does the Mental-Process Privilege Apply in the Ombudsman's Investigation?** The district court ruled Edwards could not invoke the mental-process privilege because, as the Ombudsman contended, that privilege is only available in judicial proceedings. We disagree. Section 2C.21 is dispositive. That section provides:

> A person required by the citizens' aide to provide information shall be paid the same fees and travel allowances as are extended to witnesses whose attendance has been required in the district

courts of this state. Officers and employees of an agency shall not be entitled to such fees and allowances. A person who, with or without service of compulsory process, provides oral or documentary information requested by the citizens' aide *shall be accorded the same privileges and immunities as are extended to witnesses in the courts of this state,* and shall also be entitled to be accompanied and advised by counsel while being questioned.

Iowa Code § 2C.21 (emphasis added). We enforce the plain language of the statute and conclude the district court erred in ruling the mental-process privilege is categorically unavailable during deposition testimony in an Ombudsman's investigation.

We hold IDOC ALJs are entitled to assert the mental-process privilege in an Ombudsman's investigatory deposition absent a strong showing of bad faith or improper behavior sufficient to overcome the privilege. We next address whether a sufficient showing was made to overcome Edwards's assertion of the privilege in this case.

**B. Did the Ombudsman Make a Strong Showing of Bad Faith or Improper Behavior?** "There is a 'presumption of regularity that attaches to the decisions of administrative agencies' that protects them against inquiry into how they reach their decisions based upon mere suspicion." *Martin Marietta,* 675 N.W.2d at 554 (quoting *Wright v. Indus. Comm'n,* 103 N.W.2d 531, 535 (Wis. 1960)). "However, that presumption may be overcome by a 'strong showing of bad faith or improper behavior' . . . ." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S. Ct. 814, 825, 28 L. Ed. 2d 136, 155–56 (1971)). Our focus in this case is on "improper behavior" by the warden and Edwards. *Black's Law Dictionary* lists two definitions for "improper": "[i]ncorrect; unsuitable or irregular" and "[f]raudulent or otherwise wrongful." *Black's Law Dictionary* 826 (9th ed. 2009). "Improper behavior" appears in the definition of "misconduct," which is defined as "[a] dereliction of duty; unlawful or improper behavior." *Id.* at 1089.

A party seeking to make a strong showing of improper behavior to justify disregarding the mental-process privilege must make more than "bare allegations and conclusory statements." *Kholeif v. Bd. of Med. Exam'rs*, 497 N.W.2d 804, 806 (Iowa 1993). The litigant must "point to objective facts sufficient to convince a reasonable fact finder that bias exists." *Id.* at 807 (enforcing statutory requirement of affidavit supporting bias claim to obtain closed-session deliberations of board of medical examiners in license-revocation proceeding). Notably, this does not require the party to conclusively prove there was improper behavior. In *Martin Marietta*, we noted a "preliminary showing of improper behavior" would be sufficient to allow inquiry into the mental processes of board members. 675 N.W.2d at 555; *see also McGoldrick v. Koch*, 110 F.R.D. 153, 155 (S.D.N.Y. 1986) ("[W]here a party has made a *prima facie* showing that the decision by an agency or a judicial officer is tainted by impropriety, the decision-making process may be an appropriate subject of inquiry.").

In the absence of such a strong showing, the mental-process privilege limits the questions counsel may ask the party asserting the privilege. Generally, the questioning "is 'limited to information concerning the *procedural steps* that may be required *by law* and does not extend to inquiries into the mental processes of an administrator which, as being part of the judgmental process, are not discoverable.'" *DeCoster*, 608 N.W.2d at 790 (quoting *People for Envtl. Enlightenment & Responsibility (PEER), Inc. v. Minn. Envtl. Quality Council*, 266 N.W.2d 858, 873 (Minn. 1978)). In *DeCoster*, we upheld the mental-process privilege because the record in that case was "devoid of any proof—or even a hint—of political influence affecting the deliberations at issue." *Id.*

By contrast, in this case, the Ombudsman contends undisputed facts in the record establish a showing sufficient to overcome the privilege. Edwards

and IDOC contend otherwise. The district court did not decide whether the requisite showing was made because it erroneously concluded the privilege is unavailable during an Ombudsman's investigation. Ordinarily, we do not decide issues not reached by the district court, but we may affirm an order on alternative grounds supported by the record and urged below. *See Venard v. Winter,* 524 N.W.2d 163, 165 (Iowa 1994) ("[A] successful party need not cross-appeal to preserve error on a ground urged but ignored or rejected by the district court."). Here, we are well positioned to do so because the parties already briefed this issue before the district court and on appeal, no party has requested the opportunity to offer additional evidence, and undisputed facts in the record are determinative. In that respect, this appeal differs from *Martin Marietta,* a case we remanded with directions to allow limited depositions of quasi-judicial decision makers before the district court reevaluated whether the requisite showing had been made.

In that case, Martin Marietta applied for a conditional use permit to the county board of adjustment, which was denied, even though it had approved a similar application for a neighboring property. *Martin Marietta,* 675 N.W.2d at 547–49. Martin Marietta argued that a key witness, the county director of planning and development, Murray McConnell, who had previously voiced his support for Martin Marietta's application, "did an about face" because he "had allegedly been threatened with the loss of his job." *Id.* at 552. Martin Marietta's attorney filed an affidavit attesting that was what McConnell told him; McConnell filed his own affidavit denying the conversation took place. *Id.* Martin Marietta sought depositions of McConnell and members of the board of adjustment and board of supervisors "to determine whether undue influence had been exercised." *Id.*

The district court granted the county's motion for protective order to prohibit the depositions of the board members. *Id.* at 553. We reversed,

concluding that, although Martin Marietta had failed to make a sufficient showing of bad faith or impropriety to defeat the mental-process privilege at that stage, it was entitled to depose the board members regarding their communications. *Id.* at 554. "In that way, Martin Marietta would at least have the opportunity to establish preliminarily that Board of Adjustment members were indeed subject to improper influence that might have led to its decision." *Id.* ("Unless such discovery is allowed, how else could Martin Marietta make such a preliminary showing?"). We noted that a preliminary showing of improper influence "would be more than a mere suspicion and would in our judgment overcome the presumption of regularity." *Id.*; *see also In re Enforcement of a Subpoena,* 972 N.E.2d at 1033 (clarifying that the judicial deliberative privilege does not preclude inquiry "into whether a judge was subjected to improper 'extraneous influences' or ex parte communications during the deliberative process [because,] [b]y definition, such . . . communications lie outside the protected sphere of the judge's internal deliberations").

Thus, in *Martin Marietta,* we remanded the case to allow depositions of the quasi-judicial decision makers to proceed in stages:

> On remand the district court shall allow discovery depositions . . . limited to whether there was communication with the Board of Adjustment members and what that communication was. If the district court determines that Martin Marietta has made a showing that such communications were improper or made in bad faith, it may allow Martin Marietta to inquire into the mental processes of the Board of Adjustment members in reaching their decision.

*Martin Marietta,* 675 N.W.2d at 557.

This two-step approach was appropriate in that case because whether improper ex parte communications had occurred was sharply disputed in the record on appeal, thus leading us to conclude that Martin Marietta had not yet made a sufficiently strong showing. *Id.* at 554. Allowing limited depositions on

remand provided Martin Marietta the opportunity to make a record while protecting the privilege unless and until the district court determined an adequate showing had been made to overcome it. *Id.* By contrast, in this case, *undisputed* facts in the existing record establish the requisite showing to overcome Edwards's assertion of the privilege.

Significantly, it is undisputed the warden sent a prehearing email to Edwards stating, "Please exercise sanctions to fit situation (180 to 365)." We cannot condone such ex parte communications from a warden to the IDOC ALJ, whose independence is statutorily mandated, particularly when the warden himself is to hear the inmate's appeal. *See Botsko,* 774 N.W.2d at 853 ("The combination of advocacy and adjudicative functions has the appearance of fundamental unfairness in the administrative process."); *see also* Iowa Admin. Code r. 201—50.21(4)(*b*)(13) (requiring ALJs to make their decisions "solely on information obtained in the hearing process"); Mayes, 60 Drake L. Rev. at 829 ("In the context of the administrative judiciary, the Supreme Court has stated that administrative hearing officers are to be 'free from pressures by the parties or other officials within the agency.' " (quoting *Butz,* 438 U.S. at 513, 98 S. Ct. at 2914, 57 L. Ed. 2d at 920)). The facial impropriety of the warden's email to Edwards is all the more troubling because he is statutorily prohibited from increasing sanctions on appeal. *See* Iowa Code § 903A.3(2). We conclude this email, in combination with other evidence, shows improper conduct sufficient to overcome Edwards's mental-process privilege.

The other undisputed facts include: (1) Edwards's initial sanction doubled the allowable sanction for loss of earned time for a class "B" assault and matched the warden's suggested penalty; (2) the assault did not involve a weapon or bodily fluids to justify the penalty imposed; (3) no other aggravating factors were listed; and (4) Edwards changed the assault to class "A" after the Ombudsman's investigation commenced, without listing any enumerated

factors or using the term "aggravated" as seen in other decisions. The Ombudsman also argues Edwards told the assistant Ombudsman twice in informal, unsworn interviews that she chose *not* to aggravate her initial decision, while the warden stated she intended to aggravate the assault to a class "A" all along. We give no weight to these statements, however, because Edwards did not stipulate or otherwise admit to making those statements, and the assistant Ombudsman submitted no affidavit attesting that such statements were made by Edwards. We instead rely on the undisputed evidence in the record.

Edwards alone can explain whether the warden's prehearing email or later communications influenced her decisions as to Linderman's discipline; however, she cannot do so without revealing her mental processes. Edwards and IDOC have declined to waive the mental-process privilege voluntarily.[6] As the court observed in *North Pacifica, LLC v. City of Pacifica*, "perhaps the most important factor in determining whether the deliberative process privilege should be overcome [is] the availability or unavailability of comparable evidence from other sources." 274 F. Supp. 2d 1118, 1124 (N.D. Cal. 2003). This factor further supports overcoming Edwards's mental-process privilege. Compulsory testimony from an ALJ as to why she made a particular decision should be a last resort. Here, the Ombudsman has no other means to ascertain whether her independence was compromised by improper influence.

We conclude the Ombudsman has made the strong showing required to overcome Edwards's mental-process privilege. Accordingly, the district court did not abuse its discretion by overruling Edwards's mental-process privilege and ordering her to submit to the Ombudsman's deposition. We hold the

---

[6]The mental-process privilege can be waived by its holder. *In re Enforcement of a Subpoena,* 972 N.E.2d at 1034 n.7 (noting judge may waive judicial deliberative privilege to defend allegations of partiality).

Ombudsman is entitled to depose Edwards not only regarding her communications with the warden and others, but also regarding her thought processes to explain her decisions in Linderman's disciplinary proceedings.

## V. Conclusion.

We hold administrative law judges in the department of corrections are entitled to assert the mental-process privilege in an Ombudsman investigation, but that privilege may be overcome upon a strong showing of bad faith or misconduct. For the reasons explained above, the Ombudsman has made the requisite showing to overcome Edwards's assertion of the privilege as to her decision in Linderman's disciplinary proceeding. We therefore affirm the district court's order overruling her mental-process privilege and compelling her to submit to the Ombudsman's deposition.

**AFFIRMED.**

All justices concur except Zager, J., who dissents.